RIVERSIDE GENERAL HOSPITAL, RESPONDENT, v. NEW JERSEY HOSPITAL RATE SETTING COMMISSION, APPELLANT.

Argued September 25, 1984—Decided February 20, 1985.

*Charlotte Kitler,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Bruce D. Shoulson* argued the cause for respondent (*Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue here is whether there is sufficient credible evidence to support the determination of the New Jersey Hospital Rate Setting Commission (Commission) to exclude the costs of pension and dental plans of Riverside General Hospital (Riverside) from the calculation of that hospital's reimbursement rates. The Commission's determination was made pursuant to the Health Care Facilities Planning Act, *N.J.S.A.* 26:2H–1 to –52.

In 1981, the hospital rate setting program authorized under a 1978 amendment to the Health Care Facilities Planning Act of 1971, *N.J.S.A.* 26:2H–1 to –52 (Health Care Act), first became applicable to Riverside. The Health Care Act was enacted in 1971 in response to widespread public concern over the spiraling costs of institutional health care. *In the Matter of the 1976 Hospital Reimbursement Rate for William B. Kessler Memorial Hospital,* 78 *N.J.* 564, 567 (1979). The declared public policy underlying the Act was:

> that hospital and related health care services of the highest quality, of demonstrated need, efficiently provided and properly utilized at a reasonable cost are of vital concern to the public health. [*N.J.S.A.* 26:2H–1.]

The 1971 law authorized the Commissioner of Health to set rates only for Blue Cross and governmental programs such as Medicare and Medicaid. *L.*1971, *c.* 136, ¶ 18. The method

employed for determining the rates focused primarily on the actual costs for services projected by the hospital, and furnished a limited number of incentives to improve efficiencies in hospital operation.

In 1978, the Health Care Act was substantially amended by *L.*1978, *c.* 83, effective July 20, 1978. Among the major changes effected by the Amendment was the express statement in the public policy section of the Act that cost containment is now an objective of the Act. *N.J.S.A.* 26:2H-1. Moreover, the 1978 Amendment created a Hospital Rate Setting Commission with the power to approve rates for all payors of hospital services and altered the manner in which these rates are first prepared and proposed to hospitals, and then adjusted. Senate Institutions, Health & Welfare Committee, Statement to Senate, No. 446 (1978).

Stated simply, the Amendment establishes a three-step system for the setting of hospital rates. First, the Commissioner of Health proposes for each hospital a preliminary cost base [1]—that proportion of its expenses that the Commissioner determines deserves to be covered by the hospital's charges to its patients. *N.J.S.A.* 26:2H-2(k). The preliminary cost base is annually increased by an economic factor to account for inflation. *N.J.S.A.* 26:2H-18.1(b). Then, the Commissioner of Health proposes for each hospital a "certified revenue

---

[1] *N.J.S.A.* 26:2H-2(k):

    k. "Preliminary cost base" means that proportion of a hospital's current cost which may reasonably be required to be reimbursed to a properly utilized hospital for the efficient and effective delivery of appropriate and necessary health care services of high quality required by such hospital's mix of patients. The preliminary cost base initially may include costs identified by the commissioner and approved or adjusted by the commission as being in excess of that proportion of a hospital's current costs identified above, which excess costs shall be eliminated in a timely and reasonable manner prior to certification of the revenue base. The preliminary cost base shall be established in accordance with regulations proposed by the commissioner and approved by the board.

·base" [2]—an amount determined by the Commissioner that must be reimbursed to the hospital. *N.J.S.A.* 26:2H–2(*l* ). Finally the hospital's rates are approved by the Commission, based on the hospital's certified revenue base figure. *N.J.S.A.* 26:2H–4.-1(b). The preliminary cost base, the certified revenue base, and the schedule of rates are determined in accordance with regulations adopted by the Commissioner of Health with the approval of the Health Care Administrative Board. *N.J.S.A.* 26:2H–2(k), –18(b). However, they must ultimately be approved by the Commission. *N.J.S.A.* 26:2H–4.1(b).

The regulations setting forth the method by which a hospital's preliminary cost base is determined are found at *N.J.A.C.* 8:31B–3.1 to –3.90. It is provided therein that two of the components of the preliminary cost base are reasonable direct patient care costs and reasonable indirect patient care costs. *N.J.A.C.* 3:31B–3.2. Direct patient care costs include, among other things, salaries and fringe benefits for employees associated with rendering care directly to patients, such as nurses, laboratory technicians, therapists, dieticians, and housekeeping personnel. Indirect patient care costs include those costs such as institutional overhead expenses for managerial, educational, research and maintenance functions, including salaries and fringe benefits for staff associated with hospital functions. All hospital costs, such as salaries and fringe benefits, are allocated between direct and indirect costs. The precise method of allocation is described in *N.J.A.C.* 8:31B–3.18.

As stated previously, a key feature of the 1978 Amendment was the declared public policy of the Act to contain hospital costs. The method used to achieve this containment objective

---

[2]*N.J.S.A.* 26:2H–2(*l* ):

*l.* "Certified revenue base" means the preliminary cost base adjusted by the commission, as appropriate and necessary pursuant to regulations proposed by the commissioner and approved by the board, to provide for the financial solvency of a hospital which is properly utilized and which delivers, effectively and efficiently, appropriate and necessary health care services of a high quality required by its mix of patients.

also sought to increase the efficiency of the hospital's operations through a system of "incentives" and "disincentives" set forth in the regulations. Under this method, an individual hospital's costs in particular functions are compared to those of other hospitals operating within a certain area. Both a hospital's direct and indirect patient care costs are screened against a standard developed for that hospital's peer group.

The disincentives and incentives in the area of direct patient care cost are not arrived at by an analysis of the costs of particular items or services. Rather, the incentives and disincentives are determined by comparing a particular hospital's historic or base year costs for each separate Diagnosis Related Group (DRG)[3] to the standard by peer group for each DRG. *See N.J.A.C.* 8:31B–3.23. The regulations are designed to establish a prospective rate of reimbursement related to the measure of hospital resources consumed for each particular illness and identified as a price per case by DRG. *N.J.A.C.* 8:31B–5.1.

For example, if a hospital exceeds the standard in a particular DRG by $100 per case and has 10 such cases per year, the total disincentive for that DRG is $1,000. If, on the other hand, the same hospital renders the same at a cost below the standard in another DRG by $20 per case and has 1,000 such cases per year, the total incentive for that DRG would be $20,000. Assuming the two examples cited above were the only cases in which the hospital deviated from the standard, it would have a direct patient care incentive of $19,000.

If a hospital's costs are below the standard, it is deemed to be operating more efficiently than its peers and has an "incentive." In such a case, the hospital is entitled to charge rates that are designed to provide it with income in *excess* of its costs

---

[3]Diagnosis Related Groups (DRG) are categories of hospital inpatients with similar clinical characteristics, such as diagnosed condition, age, sex, etc. Patients in each DRG can be expected to consume similar amounts of hospital resources. *N.J.A.C.* 8:31B–5.1.

in the amount of the incentive.  *N.J.A.C.* 8:31B–3.64(a)(3).  Conversely, if a hospital's costs exceed the standard, it is deemed not to be operating as efficiently as its peers and has a "disincentive."  In such a case, its rates will be set at the standard so that the hospital will not be paid for its inefficiencies.  See *N.J.S.A.* 26:2H–2(k); *N.J.A.C.* 8:31B–3.7 to –3.39. Thus, the rates allowed will yield revenues less than the hospital's costs.

## I

Riverside General Hospital is a 224 bed, acute care, full service hospital located in Secaucus, New Jersey.  Riverside, a partnership with 140 investors, operates as a profitmaking venture.

Riverside opened in 1976 and operated at a deficit until 1979, when its net operating revenues exceeded its net operating expenses by $1,258,650.  In 1980, this profit increased by 18.2% to $1,487,233.  Fifty percent of Riverside's profits are distributed by Riverside to its partners to satisfy their federal income tax obligations, and the remaining profits are used to pay off debt services, install new equipment, and institute new services.

In 1979 Riverside established a pension plan for its salaried employees, which became effective January 1, 1980.  The plan had a first year cost of $132,000.  In July 1981, Riverside established a dental plan for its salaried employees that had a first year cost of $27,500.

The Commissioner of Health determined Riverside's proposed preliminary cost basis for the rate year 1981 to be $19,988,582. The preliminary rate base was based on Riverside's 1979 budget, adjusted to account for inflation.  In February 1981, the Commissioner issued a corresponding rate schedule.  Since Riverside did not have a pension or dental plan in 1979, its preliminary cost basis, and hence its chargeable rates, for 1981 did not include the cost of its salaried employees' pension and dental plans.

Accordingly, in May 1981, Riverside filed an administrative appeal with the Commissioner requesting that its schedule of rates be adjusted to reflect the $159,500 cost of the two plans. Riverside first asserted that the costs were reasonable and commonplace. It contended that the plans, and hence the costs, were justified and necessary to enable Riverside to remain competitive with other area hospitals in attracting hospital workers. Riverside established that of the nine hospitals in its immediate area, Riverside was the only one that did not have a pension and dental plan in 1979; of the nine hospitals in the immediate area, only one had a lower hourly starting rate for registered nurses than Riverside, but that hospital had both pension and dental plans in effect for its staff; and of the five hospitals participating in the new rate program in 1981, Riverside had the lowest fringe benefit factor.

Most importantly, the costs of the pension and dental plans of the nine hospitals in the immediate area were all included in their respective preliminary cost base. Accordingly, Riverside argued that it was being penalized unfairly because, as a new hospital, it had been unable to offer the benefit plans until it commenced to operate profitably after 1979. Therefore, unlike the other area hospitals, it was not allowed to include the cost of these plans in its preliminary cost base.

In July 1981, a Health Department rate analyst performed a detailed review of Riverside's preliminary cost base. That analyst concluded that Riverside should not receive an adjustment for its pension and dental plan costs. Her conclusion was based on the contention that (1) fringe benefits were a management prerogative, and therefore the hospital could fund the plans with its 9% labor economic factor, a yearly cost basis increase automatically granted to all the hospitals in the area to increase salaries either directly or through an increase in fringe benefits, and (2) inasmuch as Riverside had over $320,000 in disincentives, "monies cut-back in the high cost areas [could] be allocated to the Fringe Benefits Packages."

In the fall of 1981, Riverside petitioned for and was granted a hearing before the full Commission on its preliminary cost base and proposed schedule of rates. At the hearing, Riverside first noted that the rate analyst's calculation of the disincentives on the direct patient care cost of $85,509 and indirect patient care cost of $237,614 was erroneous. Riverside had a disincentive of $40,000 only in the direct patient care cost component, and had a slight incentive in the indirect patient care cost component. At the hearing the Department of Health conceded that it had miscalculated disincentives for Riverside and agreed that Riverside had a slight incentive in the indirect patient care cost component and a disincentive in the direct care cost component of approximately $40,000.

Next, Riverside criticized the rate analyst's statement that fringe benefits could be funded from the economic factor granted to Riverside. Riverside noted that it was granted a labor economic factor of 9.1% per year with which it could either increase salaries or fringe benefits. Riverside argued it would have less monies available for salary increases if it were required to fund the fringe benefits programs with the economic factor. Further, other area hospitals received the same 9.1% economic factor, but since their pension and dental plan costs were included in their preliminary cost bases, they were able to use the increased funds from the economic factor solely for wage increases. Such a disparity in circumstances would render Riverside uncompetitive with its peer hospitals, since it already had one of the lowest starting rates and fringe benefit factors for registered nurses in the area.

Riverside also contested the Department's contention that it could use its "profits" to fund the plans. Riverside's representative testified that 50% of the profit generated by the hospital was distributed to the partners to satisfy their income tax obligations. Riverside contended that the Department did not understand the tax consequences of proprietary hospitals. The Department of Health recognized that the balance of the profit was applied by Riverside to debt service, new equipment, and

new services. Nevertheless, the Department still maintained that Riverside could fund the plans through the economic-factor adjustment. Further, the Department of Health stated that as a matter of policy, it did not normally allow pension and dental costs to hospitals because it believes that such benefits are a management prerogative. No written support for this statement was produced at the hearing.

At the hearing a representative of Riverside testified that in 1979 Riverside was having trouble attracting qualified workers. He reiterated that Riverside instituted the plans to remain competitive with other area hospitals, each of which had plans and each of which, except one, had paid higher starting salaries for nurses than had Riverside. While noting that Riverside's rate of turnover for employees was no greater than the rate of other area hospitals, he attributed this factor to the newness of the facility, its good location, and the fact that Riverside had instituted the plans.

Immediately after the final statement by the Department of Health rate analyst, the Commission voted to uphold the Department's recommendation as follows:

ACTING CHAIRMAN MURRAY: Any other observations? Does everyone feel that we have aired this item sufficiently?

MR. PAYNE: I am prepared to make a motion.

ACTING CHAIRMAN MURRAY: Please do.

MR. PAYNE: I move that we accept the recommendation of the Department of Health denying the additional funds.

MR. WAGNER: I second.

ACTING CHAIRMAN MURRAY: Any other discussion?

All in favor. So moved.

Riverside appealed. The Appellate Division held that the record did not support the Commission's determination, vacated the determination, and remanded the cause to the Commission with the direction that it include the reasonable costs for Riverside's salaried employees' pension and dental plans in the calculation of the 1981 reimbursement rate for Riverside. The Commission successfully petitioned this Court for certification. 95 *N.J.* 203 (1983). With certain modifications as set forth in

this opinion, we now affirm the judgment of the Appellate Division.

## II

The scope of judicial review of administrative adjudications is well established by this Court.

[T]he role of the appellate court is that of determining " 'whether the findings made could reasonably have been reached on sufficient credible evidence present in the record,' considering 'the proofs as a whole,' with due regard to the opportunity of the one who heard the witnesses to judge of their credibility * * * and * * * with due regard also to the agency's expertise where such expertise is a pertinent factor." [*Mayflower Securities Co., Inc. v. Bureau of Securities in the Division of Consumer Affairs of the Department of Law and Public Safety*, 64 *N.J.* 85, 92–93 (1973) (quoting *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599 (1965)).]

■■ The application of this standard requires far more than a perfunctory review; it calls for careful and principled consideration of the agency record and findings. *Mayflower Securities, supra*, 64 *N.J.* at 93. The administrative agency must set forth basic findings of fact supported by the evidence and supporting the ultimate conclusions and final determination so that the parties and any reviewing tribunal will know the basis on which the final decision was reached. *Application of Howard Savings Institution of Newark*, 32 *N.J.* 29, 52 (1960). We should apply the "time-tested precepts of judicial review of administrative action, that agency action proceed upon an evidential foundation and that the grounds of decision be fully revealed * * *." *In re 1976 Hospital Reimbursement Rate for William B. Kessler Memorial Hospital, supra*, 78 *N.J.* at 577 (Handler, J., concurring).

■ With respect to determinations under the Health Care Act in particular, the grounds for the agency's determination must be both adequately supported by the record and fully explained. As was stated by Justice Handler in his concurring opinion in *In re Kessler*, a case involving a challenge to the rates set by the Commissioner of Health under the Health Care Facilities Act prior to its amendment in 1978:

> In this frame of reference, agency determinations should be sustained by courts on review if they are supported in the record by evidence which can fairly be regarded as adequate and reliable, taking into account the purposes of the governmental effort, the nature of the administrative function, the complexity of the subject matter, the type and quality of evidence customarily available in the health care field, and the need for administrative expertise in resolving controversies and effectuating the policies of the statute. In view of the significance and importance, as well as the newness, of the governmental action in this area, the grounds upon which the administrative agency has acted, its reasoning, and the manner in which the evidence of record has been transmuted into ultimate conclusions should be clearly disclosed and carefully explained.
>
> [*In re Kessler, supra,* 78 *N.J.* at 578–79.]

However, in this complex area where the Legislature has delegated a great amount of discretion to the administrative experts, deference must be accorded to the administrative agency's expertise and experience in its domain. *Id.* at 571; *In the Matter of the Schedule of Rates for Barnert Memorial Hospital,* 92 *N.J.* 31, 41 (1983).

### III

Applying the aforementioned scope of judicial review to this case, we conclude, as did the Appellate Division, that the Commission's grounds for its action are neither adequately supported by the record nor clearly explained.

There are essentially no basic facts in dispute in this case. The basic facts consisted in the main of factual data about which there was little or no controversy. The real matters in issue were the so-called ultimate facts or findings of the Commission—matters of opinion and judgment arrived at by the Commission based upon the factual data. "In such a situation, the function of basic findings is, broadly speaking to show how and why the Commissioner made up his mind the way he did. All the evidential data need not be repeated or even summarized ... It is sufficient if it can be determined from the document without question or doubt what facts and factors led to the ultimate conclusions reached." *Application of Howard Savings Inst. of Newark, supra,* 32 *N.J.* at 53.

A review of the record discloses that the Commission, after a cursory discussion, approved the Department of Health's recommendation (see *supra* at 467). No cogent explanation to support the Commission's summary affirmance of the Department of Health's denial of Riverside's fringe benefits reimbursement is set forth. The Commission's two-sentence written statement of its actions sent to Riverside was equally unresponsive to the requirement that an agency must disclose the basis for its decision. The morass of regulations applicable to the issue were not cited to explain the cursory approval. In short, the Commission in its decision violated the "time-tested precept" that the grounds of an agency's decision be fully disclosed.

Illustrations of the Commission's cursory and inconclusive findings are evident in the record. For example, the Commission, upon being advised that the Department had substantially misstated the disincentives of Riverside, not only failed to request an explanation from the Department as to how an error of such magnitude had arisen but also did not seek to determine the effect of such a large error on the Department's recommendation. This is inexplicable in view of the fact that the Department initially relied upon the large disincentive of Riverside for its disallowance of the pension costs. Thus, the significance of a disincentive to the Commission's decision is unclear to a reviewing court, as well as to a hospital.

The absence of an explanation leaves a further inconsistency in the record. In the proposed preliminary cost base and schedule of rates issued by the Commissioner of Health on February 27, 1981, the costs of both the pension and dental plans were allocated to indirect patient care. When the analyst reevaluated the disincentives and discovered that no disincentive existed in the indirect cost area, she reclassified the costs of the fringe benefit plans to direct patient care costs. No reason for this change is set forth in the record. Moreover, the Commission accepted the characterization without inquiry.

In reality, a characterization of these costs as entirely direct or indirect is erroneous. The cost of the plans attributed to employees involved in direct patient care should be allocated to direct patient care costs. Likewise, the cost of the plans attributed to employees involved in indirect patient costs should be allocated to indirect patient care. (See *N.J.A.C.* 8:31B–4.54, which provides that, "Employee Fringe Benefits are assigned to the cost center in which the employee's compensation is reported * * *.") Here, the corresponding costs of the plans for employees involved in indirect patient costs have not been apportioned to the indirect cost calculation. No reason for this misapportionment appears in the record.

The Department of Health also made statements unsupported by any cited regulations and that appear to conflict with the evidence. For example, the Department's representative stated that the Department does not normally allow pension and dental plan costs to hospitals. However, *N.J.A.C.* 8:31B–4.54, entitled Employee Fringe Benefits, provides for allocation of employee's fringe benefits, including pension and dental plans. Further, it is uncontradicted that each of the nine area hospitals had the cost of its pension and dental plans included in its preliminary cost bases. The Commission should require the Department of Health's representative to explain the obvious discrepancies between this statement and the facts of this case.

Moreover, despite the contention of the Commission at the hearing that no allowance for pension and dental plan costs was possible, other reasonable costs were included in the preliminary cost base of a hospital with a disincentive. In fact, while the Department of Health was laboring under the erroneous belief that Riverside had disincentives in both direct and indirect patient care components, the Department adjusted Riverside's preliminary cost to allow for the cost of a billing clerk's position and $15,136 of equipment. Consequently, there appears to be no clear relationship between the Commission's grace in granting such "reasonable" adjustments and the exist-

ence of substantial disincentives. No one can reasonably contend that pension and dental plans for salaried employees is not a reasonable and necessary expense. In fact, by including such costs in the preliminary cost base of the nine area hospitals, the Commission implicitly concedes that such costs are reasonable and necessary.

We find that based on the above record, there is much merit to Riverside's contention that the Commission was penalizing it for being a new hospital. It is clear that if Riverside had implemented its plans by 1979, the expenses of those plans would have been automatically included in the 1981 cost base. The Department offered no explanation as to why Riverside's plans were treated differently, nor did the Commission request one. The aforementioned inconsistencies are sufficient to cast substantial doubt upon the Commission's determination.

Moreover, further examination of the record discloses some misunderstanding of the economic issue involved. At the hearing the Commission realized for the first time that half of the net profit figures were distributed to the partners to satisfy their tax obligations and the remaining profits were used to reduce debt service, buy new equipment, and introduce new services. Other than a member's recognition that "[w]e are not as used to dealing with [for] profit hospitals as we are nonprofit," the Commission sought no explanation from the Department of Health as to how the disposition of profits influenced its determination that Riverside could fund the plans from profits. In fact, its unfamiliarity in dealing with proprietary hospitals may have led the Commission to conclude erroneously that Riverside's profit margin could provide a source for funding the benefit plans.

Similarly, the Commission's misunderstanding of the availability of a profit led to its erroneous insistence that increased efficiencies would decrease the disincentive, thereby creating a

surplus fund to cover the cost of the pension and dental plans. As noted by the Appellate Division:

> The disincentive does not represent excess reimbursement. If the hospital eliminates the disincentive, it would not receive an additional payment of $40,000 through the rate setting system. Thus the Commission's contention that the presence of a disincentive indicates the existence of a pool of surplus funds is highly misleading and clearly without merit.

## IV

In conclusion, our review of the record discloses that the Commission accepted the rate analyst's recommendation without adequately investigating the obvious failings of such a recommendation. The two sentence report to Riverside sets forth ultimate conclusions unsupported by the record. Accordingly, we conclude that the Commission's actions are not adequately supported by the record and are not fully explained.

We therefore affirm the Appellate Division judgment insofar as it held that the Commission's determination is not supported by credible evidence in the record, and that it should be vacated and the cause remanded to the Commission. However, we reverse the judgment of the Appellate Division insofar as it directs the Commission to include the reasonable costs of the salaried employees' pension and dental plans in the calculation of the 1981 reimbursement rate for Riverside. Because we accord due deference to the expertise of the Commission, we direct the Commission to conduct another hearing in which it should examine the facts, carefully apply the pertinent regulations, and clearly set forth its conclusions.

As modified, the judgment of the Appellate Division is affirmed.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*Opposed*—None.