214 N.J. Super. 599 (1987)
520 A.2d 805
SAINT BARNABAS MEDICAL CENTER, PLAINTIFF-APPELLANT,
v.
NEW JERSEY HOSPITAL RATE SETTING COMMISSION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1986.
Decided January 14, 1987.
*600 Before Judges ANTELL and LONG.
Todd Brower argued the cause for appellant (Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone, attorneys; Barry H. Ostrowsky, of counsel and on the brief; Todd Brower, on the brief).
Eileen O'Donnell, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Michael R. Clancy, Deputy Attorney General, of *601 counsel; Charlotte Kitler, Deputy Attorney General, on the brief).
The opinion of the court was delivered by LONG, J.A.D.
Saint Barnabas Hospital Medical Center (St. Barnabas) here challenges a determination of the New Jersey Hospital Rate Setting Commission (HRSC) denying it an adjustment in its rate schedule with respect to the issue of residents' salaries.
The case arose under the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 et seq., which provides that hospital rates of reimbursement are subject to regulation. A detailed history of the Act which constitutes the backdrop for this appeal is set forth in Riverside General v. N.J. Hosp. Rate Setting Commission, 98 N.J. 458, 461-464 (1985). The rules originally adopted under the Act were known as the Standard Hospital Accounting and Rate Evaluation (SHARE) Manual. N.J.A.C. 8:31A-1.1 et seq. In 1980, a new comprehensive system of rate-setting regulations was adopted pursuant to the Act, incorporating many aspects of the SHARE manual. N.J.S.A. 26:2H-4.1(b).
The rate-setting system is designed to set a prospective rate of reimbursement in advance of actual treatment, which is related to the hospital resources consumed in treating particular illnesses, categorized as Diagnosis Related Groupings (DRGs), see N.J.A.C. 8:31B-3.4; 8:31B-5.1. Each DRG reflects a wide variety of different kinds of costs associated with hospital care. These costs are derived from the actual expenses incurred by a hospital during a base year and reported to the Department of Health, N.J.A.C. 8:13B-3.16. The reported costs are allocated generally between two major categories: (1) direct patient care costs, such as the salaries and fringe benefits for nurses, dieticians and other employees engaged in the direct delivery of patient care, see N.J.A.C. 8:13B-3.21, 8:31B-4.32, and (2) indirect patient care costs, or the institutional overhead expenses for managerial, educational (including *602 residents in teaching programs), research and maintenance functions, see N.J.A.C. 8:31B-3.24(a). Both direct and indirect patient care costs are then screened for reasonableness by comparison with a standard developed for the hospital's peer group as a major teaching, minor teaching or non-teaching hospital, N.J.A.C. 8:31B-3.22, 8:31B-3.24. Although the screening formulae differ between direct patient care costs and indirect patient care costs, both categories are governed by a system of "incentives" and "disincentives" designed to promote hospital efficiency by containing costs.
Driving this system is the principle that if a hospital's costs are below the standard, it is operating more efficiently than its peers and should be rewarded with an "incentive." In such a case, the hospital is entitled to charge rates designed to provide it with income in excess of its costs in the amount of the incentive. N.J.A.C. 8:31B-3.24(b). Conversely, if a hospital's costs exceed the standard, it is deemed not to be operating as efficiently as it peers and is penalized with a "disincentive." In such a case, its rates will be set at a standard which will yield revenues less than the hospital's costs. N.J.S.A. 26:2H-2(d); N.J.A.C. 8:31B-3.7 to -3.39.
The screening of residents' costs is the specific area at issue here. Methodologically, the overall costs for residents' salaries as reported by the hospital are broken down into a unit cost and measured against the median unit cost of the hospitals in the peer group. If the hospital's unit cost exceeds 10% of the median (the "reasonable cost limit"), the excess amount is disallowed. N.J.A.C. 8:13B-3.24(d). The unit of service for converting total costs for hospital residents (the "RSD" cost center) is denominated in the regulations as a Full Time Equivalent (FTE) N.J.A.C. 8:31B-3.24(d). The regulations further prescribe that the hospital's reporting of costs for residents should be in accordance with the definitions specified in the SHARE system, N.J.A.C. 8:31B-4.117 note. In turn, the SHARE regulations call for the reporting of the total hours paid to residents and the use of 2080 hours per year as the *603 gauge for a FTE. N.J.A.C. 8:31A-2.1(a)(4), 8:31A-3.1(a)(128), 8:31A-4.1(a)(15).
Put another way, each year the hospital reports the total number of hours worked by all residents. This figure, which is ordinarily tracked on a computer, is made up of time fragments because residents usually rotate in and out of the hospital for brief periods throughout the year. The computer picks up the number of weeks each resident spends at the hospital, multiplies that number by a set hourly figure per week, totals the figures for all residents and records them. This number is then divided by the 2080-FTE, to obtain the number of full time equivalent working residents. The number of residents is then divided into the total dollars paid to all residents which gives the cost per unit (RSD) or the residents' yearly salary. This cost per unit is then compared to that of other hospitals in the group and if it is over 10% higher than the median cost the excess is excluded from reimbursement. N.J.A.C. 8:31(B)24.
On April 30, 1983, St. Barnabas submitted its actual cost data forms for 1982 for the purposes of developing the hospital's 1984 schedule of rates. On these forms, St. Barnabas reported having 116.5 full-time residents who worked a total of 227,279 salaried hours during 1982. In arriving at 116.5 full-time residents, St. Barnabas used a screening figure of 1950 annual hours, as opposed to the 2080-FTE standard prescribed by the regulation. This figure (1950) was calculated by multiplying 37.5 hours per week by 52 weeks. Thus, St. Barnabas divided 227,279 total hours by 1950 and arrived at 116.5 FTE residents.
St. Barnabas used a 1950-hour screen instead of the 2080-FTE standard because its 227,279 total resident hours were calculated on a 37.5-hour work week, the figure which the St. Barnabas computer had programmed for all employees. In order to avoid reprogramming or calculation of resident hours manually, St. Barnabas simply altered the FTE screen from 2080 to 1950 to account for the way resident hours were kept track of.
*604 What occurred next is that the Department of Health received St. Barnabas' figure of 227,279 salaried hours with the information as to how it was calculated. However, it rejected St. Barnabas' application that a 1950-hour screen be utilized in determining FTE residents and divided the total number of resident hours submitted by St. Barnabas by the 2080 FTE. This resulted in an FTE of 109.27, instead of 116.5, residents. Thus a smaller number of residents were divided into the total number of dollars paid to all residents at St. Barnabas which resulted in an "average" salary which was higher than the actual salary paid to the St. Barnabas residents and, more importantly, was higher than the peer group reasonable cost limit of $25,749.28. As a result, a total disincentive of $55,000 was registered against St. Barnabas. St. Barnabas then applied to the HRSC for an adjustment. It urged that since residents actually work an enormous numbers of hours unrelated to an ordinary work week, the 40 hour FTE has no reality component and that a 1950-FTE screen is the "fair" way to assess the figures when a 37.5-hour work week is the basis for calculating the total number of resident hours. When the HRSC declined to waive the 2080-FTE screen and denied the adjustment, St. Barnabas requested an opportunity to recalculate its 1982 resident hours by hand or by reprogramming its computer on a 40 hour per week basis. When this also was denied, St. Barnabas filed this appeal.
We begin our analysis with the observation that there is no question of false reporting in this case or of manipulation of the system by St. Barnabas. Indeed, it was conceded by the State at oral argument that St. Barnabas was entirely free to have calculated its total resident work hours on a 40 hour per week basis at the outset. The reason for this, as both parties concede, is that neither the 40-hour work week prescribed by the regulation nor the 37.5-hour week used by St. Barnabas have any real meaning where residents are concerned. This is because residents, unlike other employees, do not adhere to any fixed work week. Thus, whether to use a 37.5 or 40 hour per *605 week screen to calculate total resident hours is an essentially arbitrary determination.
More importantly, the State is not here contending (nor could it be) that, as a matter of fact, St. Barnabas overpaid its residents or that, in reality, the St. Barnabas RSD is over 10% higher than the median cost incurred in the peer group. On the contrary, it is conceded that St. Barnabas' residents were paid on a scale which would not justify the imposition of a disincentive. The only way that it can be said that St. Barnabas "overpaid" its residents is by dividing the total resident hours figure calculated on a 37.5 hour per week basis by an FTE screen calculated on a 40 hour per week basis; when 227,279 is divided by 2080.
Rather, the State urges that every hospital is aware of the well established regulatory method for calculating FTE residents and residents' salaries, and that if, in the face of the regulatory scheme, a hospital chooses to report its total resident hours in a way which will disserve it if the prescribed 2080-FTE screen is used, it does so at its peril. Concomitantly, the State contends that it has no obligation to tailor its formulas to the vagaries of a hospitals' computer program or to look behind the numbers submitted in order to ascertain whether or not it is "fair" to apply the State standard to an individual hospital's idiosyncratic method of recordkeeping.
Given the enormous burden which devolves upon the State under reporting schemes such as this we have little difficulty with this argument as a general principle. St. Barnabas advanced no meaningful challenge to the rationality or the reasonableness of this long standing regulatory system. Bergen Pines Hosp. v. New Jersey Dept. of Human Serv., 96 N.J. 456 (1984). Nothing was presented to the HRSC to justify a waiver of the regulation except that it was "unfair" to apply the scheme because of the way St. Barnabas chose to keep its records. Indeed, it was conceded that it was entirely within the *606 power of St. Barnabas to control the recordkeeping with respect to residents at the front end of the process by keying the system to a 40-hour week. It chose not do do this for its own convenience. We see no reason why the HRSC should have modified its approach and used an FTE standard other than 2080 in order to accomodate this rather cavalier approach by the hospital. Thus, we affirm its refusal to waive the 2080-FTE standard.
We are troubled however by the determination of the HRSC not to allow St. Barnabas to recalculate its resident hours on a 40 per week basis when its application for a waiver of the regulation was rejected. While the agency had no obligation to tailor its regulatory operations to the isolated needs of St. Barnabas, we think it should have given St. Barnabas a chance, within preset time constraints, to retailor its records to the State system. Important to this conclusion is the concession by the State that St. Barnabas was entirely forthright in its approach to this issue; that it did not falsely report its figures and that it did not attempt in any way to manipulate the system inequitably to its advantage. More significantly, the result here reached  the imposition of an undeserved disincentive  does not advance the aims of the Health Care Facilities Planning Act which is at the heart of the HRSC's operations. It is simply not within the contemplation of the Act to penalize an efficient hospital by applying a disincentive where one is not warranted. We thus reverse the HRSC's refusal to allow St. Barnabas to resubmit its 1982 cost data forms with respect to residents recalculated on a 40 hour per week basis. We note that this opinion is limited to the 1982 figures because St. Barnabas has, according to the representations of its counsel at oral argument, reprogrammed its computer for residents for the years subsequent to 1982.
Affirmed in part; reversed in part.