575 A.2d 481

IN RE THE AMENDMENT OF N.J.A.C. 8:31B–3.31 AND N.J.A.C. 8:31B–3.51 BY THE STATE OF NEW JERSEY COMMISSIONER OF HEALTH AND THE STATE HEALTH CARE ADMINISTRA-TION BOARD.

and

IN RE THE AMENDMENT OF N.J.A.C. 8:31B–3.31 BY THE STATE OF NEW JERSEY COMMISSIONER OF HEALTH AND THE STATE HEALTH CARE ADMINISTRATION BOARD.

Argued January 2, 1990—Decided June 26, 1990.

532

*Eileen O'Donnell,* Deputy Attorney General, argued the cause for appellant, Department of Health (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

*Murray J. Klein* argued the cause for respondent, Warren Hospital (*Cohen, Shapiro, Polisher, Shiekman and Cohen,* attorneys; *Murray J. Klein* and *Leonard Fishman,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

This appeal concerns the facial validity of amendments to two regulations concerning New Jersey's hospital-rate-setting system promulgated by the Department of Health (Department) pursuant to the Health Care Facilities Planning Act (the Act). *N.J.S.A.* 26:2H–1 to –52. The amendments to one regulation, *N.J.A.C.* 8:31B–3.31, provide in essence that a hospital must "conditionally accept," or "not accept," its proposed Schedule of Rates in order to appeal for additional graduate medical resident positions by transfer between hospitals; moreover, any addition of such resident positions may not result in a change to a higher teaching-status peer group, thus precluding any beneficial change in rates that would ordinarily accompany enhancement of a hospital's teaching status. The challenged amendment to the second regulation, *N.J.A.C.* 8:31B–3.51(b)(4), provides that hospitals may appeal only under the "not accept" appeal option for increases in costs associated with an increase in the number of graduate medical residents above the number approved by the Hospital Rate Setting Commission for reimbursement for the period beginning July 1, 1985.

The Appellate Division concluded that the amendments to *N.J.A.C.* 8:31B–3.51(b)(4) are facially invalid because they "severely penalize" a hospital for exercising a statutory right of appeal by "exacting severe financial consequences," 227 *N.J. Super.* 386, 392, 547 *A.2d* 721 (1988), but declined to consider

the validity of the amendments to *N.J.A.C.* 8:31B–3.31. *Ibid.* We granted certification, 114 *N.J.* 507, 555 *A.*2d 624 (1989), and now reverse.

## I.

Warren Hospital (Warren) is a non-profit, general acute-care hospital located in Phillipsburg. In 1980 Warren established a family-practice residency program in an effort to respond to the need for additional family-practice physicians in the rural areas of Warren and Sussex counties. The program began as a coordinated effort between Warren and Overlook Hospital, located in Summit. At the inception of the program, Overlook Hospital provided training for first-year residents and Warren provided training for second- and third-year residents. The long-range plan was that Warren would gradually expand its program and train residents during all three years. The Department encouraged the establishment of Warren's family-practice residency program, which was partially funded by a grant from the Department of Higher Education. Rural areas, such as Warren County, have a particular need for family practitioners, who often set up practices in the areas where they trained as residents.

Between 1980 and 1985 the Department classified Warren as a non-teaching hospital for rate-reimbursement purposes. Although Warren engaged in teaching functions during those years, its family-practice program was not large enough to meet the Department's criteria for minor or major teaching hospitals. In 1986, however, Warren's program increased to over fifteen residents as a result of integration of first-year residents from Overlook Hospital into its program. Thus, for the first time, Warren's residency program qualified it as a minor teaching hospital under *N.J.A.C.* 8:31B–3.22(b)3. The amendments at issue affected Warren's ability to seek a higher teaching status based on the expansion of its residency program, its ability to appeal that issue, and its ability to recoup

costs associated with the expansion of its family-practice residency program.

In June and July 1986, Warren filed appeals in the Appellate Division, facially challenging the amendments to both regulations; the appeals were consolidated.

The Appellate Division agreed with Warren's contention that the amendments to *N.J.A.C.* 8:31B–3.51(b)(4) are invalid because they conflict with the statutory provision granting hospitals the right to appeal the sufficiency of their reimbursement rates. 227 *N.J.Super.* at 391, 547 *A.*2d 721. Pursuant to *N.J.S.A.* 26:2H–18.1a, "the [Hospital Rate Setting] Commission shall make the determinations and hear appeals provided for in this Act in a timely manner pursuant to regulations proposed by the [C]ommissioner [of Health] and approved by the [Health Care Administration] Board." The Appellate Division concluded that the amendments to *N.J.A.C.* 8:31B–3.51(b)(4) subvert the legislative intent to provide an effective avenue of appeal by relegating hospitals seeking to attain higher peer-group classifications to the "not accept" option. According to the court, "[i]t would not be realistic for [a hospital] to select the 'not accept' option, because the losses associated with that choice will never be offset by a successful appeal." 227 *N.J. Super.* at 392, 547 *A.*2d 721. The court concluded that "[b]y subverting the appeals process, these amendments frustrate the aims of the Health Care Facilities Planning Act, from which the [Department] and HRSC receive their authority to promulgate regulations." *Ibid.*

Warren also argued that the amendments to *N.J.A.C.* 8:31B–3.31 conflict with the Act's general purpose of providing equal access for all people to quality health care, including those in rural areas where more residents are needed. The Appellate Division declined to address the validity of the amendments to *N.J.A.C.* 8:31B–3.31 "because the [Hospital Rate Setting Commission] has the power to consider each hospital's eligibility on a case-by-case basis and modify actions taken in strict accord-

ance with these regulations when such actions would produce unjust results for individual institutions." *Ibid.*

## II.

The issue before us can be understood only in the context of the underlying statutory scheme and the departmental regulatory standards designed to implement it. The Act fashions a detailed regulatory scheme that governs health-care facilities and the provision of health-care services. Prompted by the "spiraling costs of institutional health care," *Riverside Gen. Hosp. v. New Jersey Rate Setting Comm'n,* 98 *N.J.* 458, 460, 487 *A.*2d 714 (1985), the Legislature sought to ensure the provision of quality health care at a reasonable cost. Substantially amended in 1978, *L.*1978, *c.* 83, the Act's major revisions reflected the legislative determination that cost-containment was "of vital concern to the public health." *N.J.S.A.* 26:2H–1. The Act delegates to the Department primary responsibility for the development and administration of a coherent health-care program, and vests authority to adopt reasonable rules and regulations to effectuate the purposes of the Act in the Commissioner of Health (Commissioner), subject to approval of the Health Care Administration Board (HCAB). *N.J.S.A.* 26:2H–52.

The Commissioner is to propose for each hospital a "preliminary cost base" and a Schedule of Rates established in accordance with duly-adopted regulations. *N.J.S.A.* 26:2H–18.1b. The Act confers on the Hospital Rate Setting Commission (HRSC) the power to approve and adjust hospital-reimbursement rates proposed by the Commissioner. *N.J.S.A.* 26:2H–4.-1a. Further, HRSC is designated as the body required to hear hospital appeals concerning rate-reimbursement issues. *N.J. S.A.* 26:2H–18.1a.

The comprehensive rate-setting system, *N.J.A.C.* 8:31B–3.1 to –3.90, is designed to set a prospective rate of reimbursement, in advance of actual treatment, that is related to the hospital resources consumed in treating particular illnesses, described

as Diagnosis Related Groupings (DRG). See *N.J.A.C.* 8:31B–3.-4; *N.J.A.C.* 8:31B–5.1. The costs for which a hospital will be reimbursed are derived from the actual expenses incurred by the hospital during a base year, in this case 1982, and reported to the Department. *N.J.A.C.* 8:31B–2.5; *N.J.A.C.* 8:31B–3.16; *N.J.A.C.* 8:31B–4.6(c).

Hospital costs are allocated between two general categories, direct patient-care costs and indirect patient-care costs. Direct patient-care costs include the salaries and fringe benefits provided to employees engaged in the direct delivery of patient care. *N.J.A.C.* 8:31B–3.21; *N.J.A.C.* 8:31B–4.32. Indirect patient-care costs include costs associated with the hospital's managerial, educational, research, and maintenance functions, including costs associated with the establishment and maintenance of graduate medical education. *N.J.A.C.* 8:31B–3.24(a). Both direct and indirect patient-care costs are screened for reasonableness by comparison with a standard developed for the hospital's "peer group," determined on the basis of the hospital's classification as either a major-teaching, minor-teaching, or non-teaching hospital. *N.J.A.C.* 8:31B–3.22; *N.J.A.C.* 8:31B–3.24. To be classified as a major or minor teaching hospital, a hospital must have a specified number of residents (fifteen), and the residencies must be in certain clinical areas. *N.J.A.C.* 8:31B–3.22(b). Costs that exceed the particular screening standard are excluded from the hospital's rates as "disincentives."

After screening the financial elements of a hospital's current cost base, the Commissioner adds adjustments for "projected economic factors" as well as a capital facilities allowance. *N.J.A.C.* 8:31B–3.20. The resulting amounts, after these adjustments, represent the "preliminary cost base" for the hospital. The Commissioner then proposes a Schedule of Rates designed to produce sufficient revenue to correspond to the cost base. *N.J.A.C.* 8:31B–3.7; *N.J.A.C.* 8:31B–3.38. Plenary power to approve the cost base and the schedule of rates is vested in the HRSC. *N.J.A.C.* 8:31B–4.1b.

The Act contemplates that the Department establish for each hospital a "certified revenue base" in order to achieve true prospectivity of the rate-setting scheme. See *N.J.S.A.* 26:2H–18.1b. Essentially, the certified revenue base is intended to prescribe a budget that will remain in place for a number of years with only minor adjustments for inflation and changes in the law. See *N.J.S.A.* 26:2H–2*l.* The system has yet to progress to the point where a certified revenue base for each hospital has been established; thus, a hospital's actual costs continue to be the primary factor in establishing its budget.

Graduate medical education plays a significant role in the rate-setting system. Costs associated with graduate medical education are expressly considered in the indirect patient-care-costs component of the preliminary cost base. As a practical matter, a hospital's reasonable costs increase as its number of residents increases, due to the significant direct-patient-care costs associated with training interns and residents and with hiring faculty physicians in various clinical specialities. Accordingly, the major teaching peer group is generally reimbursed at the highest rates, while the non-teaching peer group is reimbursed at the lowest.

### III.

### A.

Each hospital receives a Proposed Schedule of Rates, which sets forth the reimbursement rate arrived at by the Commissioner and the HRSC. All hospitals regulated by the rate-setting system have forty-five days following receipt of the proposed schedule of rates to notify the Department whether they will accept the rate schedule without alteration or whether they wish to file exceptions to any component. *N.J.A.C.* 8:31B–3.-51(b).

Departmental regulations adopted in 1979 created an appeals process that remained in effect through 1982. During those

years, a hospital had two options for appeal when it received its Proposed Schedule of Rates: the hospital could either "accept" or "not accept" its rates. If a hospital chose to "accept" its rates, it was entitled to appeal only a limited number of issues. Among those issues was a change of "peer group" classification from non-teaching status to minor teaching status resulting from an increase in the number of resident positions from the base year to the rate year. On the other hand, if a hospital chose to "not accept" its rates, it could raise any and all related issues on appeal. Choosing the "not accept" option, however, would subject the hospital's entire preliminary cost base to another review by the HRSC.

### B.

In 1983, the Department of Health markedly altered the appeals system. These revisions were specifically intended to reduce the number of appeals. The Department made clear that the changes were intended to encourage hospitals to operate within their approved revenues rather than seek increases through the appeals process. See Economic Impact Statement, 14 *N.J.R.* 737. The new regulations changed the definitions of the "accept" and "not accept" options and introduced a third option: "conditional accept." A hospital choosing to "conditionally accept" its rates could appeal a limited number of issues. *N.J.A.C.* 8:31B–3.5(b)2. Should a hospital "accept" its rates, it could appeal an even more-limited number of issues than under the "conditionally accept" provision, but would receive a cash bonus of one percent of the base-year direct-patient-care costs. *N.J.A.C.* 8:31B–3.51(b). The Economic Impact Statement to the proposed changes in the appeals system provides that "[a]cceptance by hospitals of the one percent totally accept option will enable facilities to receive full and reasonable reimbursement at the beginning of the rate year and avoid the appeals process." 14 *N.J.R.* 737.

The 1983 regulations modified the "not accept" option. A hospital deciding to "not accept" its rates opened its entire budget to review. In addition, its rate schedule was recalculated on the "efficiency standard," rather than the "incentive standard," which was likely to result in a lower level of reimbursement. (The "efficiency standard" is a calculation used to identify presumptively excess cost. *N.J.A.C.* 8:31B-3.5(b); *N.J.A.C.* 8:31B-3.51(b)(3).) Finally, an "overspending challenge," calculated to lower a hospital's reimbursement, was also added to the review process for hospitals choosing the "not accept" option. *N.J.A.C.* 8:31B-3.51(b)(3). Under the 1983 regulations, a hospital seeking to appeal its "peer group" classification/teaching status could no longer do so under the "accept" option. Instead, the hospital would have to "conditionally accept" its rates.

To recapitulate, under the appeals scheme as modified in 1983, a hospital could either accept its schedule of rates, conditionally accept it, or not accept it at all. *N.J.A.C.* 8:31B-3.51(b). The number and type of issues a hospital could appeal to the Department, and ultimately to the Commission, depended on the appeal option it chose, with the "not accept" option placing no restrictions on the rate issues. a hospital could raise in its exceptions. *Ibid.* The preliminary cost base of a hospital not accepting its rates for any year, however, would again be reviewed, and its revised schedule of rates would be based on the efficiency standard. An additional one percent of all direct patient-care costs would be added to a hospital's rates if it were to accept its schedule in the first instance. *Ibid.*

## C.

Because the number of graduate-medical-education-resident positions funded through the State's hospital-patient-care revenues had increased dramatically between 1979 and 1985, the Commissioner appointed a special task force specifically to

study issues concerning reimbursement of costs associated with graduate medical education.

The report, "Overview of the New Jersey Health Care System: A Vehicle for Discussion," Paper III Graduate Medical Education, concluded, among other things, that by 1990 the supply of physicians in New Jersey would be at least sufficient to meet the demand for physician services. The task force recommended a one-year moratorium on the approval of additional graduate-medical-education positions to control the growth of the State's physician population.

Another report entitled "A Policy Prospectus for Graduate Medical Education in New Jersey," published by the State Advisory Graduate Medical Education Counsel (AGMEC), identified problems with the treatment of costs of graduate medical education under the reimbursement system, concluding that the "peer group" classification of hospitals into major, minor, and non-teaching categories provided hospitals with an incentive to add graduate-medical-education programs in order to attain a higher teaching classification and a higher rate of reimbursement. The AGMEC report also noted the absence of available standards under the reimbursement scheme by which to determine whether newly created residency positions were actually needed.

In response to the findings and recommendations of AGMEC and its task force, the Department adopted amendments to *N.J.A.C.* 8:31B–3.31 and *N.J.A.C.* 8:31B–3.51(b)(4) in April and July 1986. *N.J.A.C.* 3.51(b)(4) was amended to read as follows:

Notwithstanding the above, effective for the 1986 Proposed Schedule of Rates, hospitals may [ ] appeal [only] under the not accept option for costs associated with numbers of graduate medical residents in excess of the total number of FTE residents approved by the Commission for reimbursement for the period beginning July 1, 1985. [18 *N.J.R.* 844.]

The July 1986 amendment to *N.J.A.C.* 8:31B–8.31(c) states:

The Commission may approve hospital appeals to transfer Commission approved resident positions and associated costs between hospitals. *A hospital must conditionally accept or not accept in order to appeal for additional resident positions by transfer.* A hospital may appeal under any option to

reduce the number of resident positions by transfer. *An addition of resident positions by transfer may not result in a change to a higher teaching status peer group.* A reduction of resident positions by transfer may result in a change to a lower teaching status peer group. The approved costs associated with a transferred resident position may not increase solely as a result of the transfer. [18 *N.J.R.* 1380 (emphasis added).]

Thus, the net effect of these amendments was that a hospital seeking to add resident positions by transfer must "conditionally accept" or "not accept" its Proposed Schedule of Rates. Even if a hospital was permitted to add the resident positions, it would not attain a higher teaching status for rate-reimbursement purposes. Further, a hospital could appeal only under the "not accept" option for increases in costs associated with the addition of resident positions.

### D.

Subsequent to the Appellate Division's decision, the Department modified the hospital rate-setting appeals system, significantly easing the restrictions on hospital appeals related to reimbursement for costs associated with changes in GME programs. Thus, the issues on this appeal are limited in their application to hospital rate appeals filed during the period between 1986 and 1990 when the regulations at issue were in effect.

Pursuant to the most recent amendments to *N.J.A.C.* 8:31B–3.51, adopted July 1989, a hospital may appeal under the "accept" option for costs associated with "an increase in the number of residents that does not exceed the statewide number approved by the Commissioner for the twelve-month period beginning July 1, 1985[,] and is offset by corresponding decreases in resident costs in other New Jersey hospitals." *N.J. A.C.* 8:31B–3.51(b)(1). Hospitals choosing to "accept" their rates continue to receive an increase of one percent of direct patient care costs. Hospitals that "accept" their rates also receive an increase to direct- and indirect-patient-care costs equal to the technology factor (as described in *N.J.A.C.* 8:31B–3.26) and the operating margin (as described in 8:31B–3.38).

Significantly, under the latest regulation, a hospital that chooses to "not accept" its rates no longer has its preliminary cost base recalculated on the "efficiency standard." Thus, a significant financial disincentive associated with the "not accept" option has been eliminated. A hospital choosing the "not accept" option still forfeits the one-percent increase of direct-patient-care costs, and also forfeits the technology-factor and operating-margin increases afforded by the accept option. Forfeiture of those increases, however, is offset by the hospital's ability to raise all reimbursement-rate issues on appeal. The "conditionally accept" option has been eliminated.

Further, in June 1988, the Department adopted an amendment to *N.J.A.C.* 8:31B–3.31(c), which allows hospitals seeking to add residents through transfer to appeal for those additional costs under the accept option. The regulation still provides that the addition of resident positions by transfer may not result in a change to a higher teaching status peer group. Amendments to *N.J.A.C.* 8:31B–3.22 to –3.24, adopted in July 1989, make assignment to a particular teaching-status peer group less significant for rate-reimbursement purposes.

## IV.

We note our limited role when evaluating the validity of state administrative regulations. We accord substantial deference to the regulations adopted by administrative agencies, based on our recognition that certain subjects are within the peculiar competence of that agency. *Bergen Pines Hosp. v. Department of Human Servs.*, 96 *N.J.* 456, 474, 476 *A.*2d 784 (1984). We have consistently recognized that the "basic purpose of establishing agencies to consider and promulgate rules is to delegate the primary authority of implementing policy in a specialized area to governmental bodies with staff, resources and expertise to understand and solve those specialized problems." *Ibid.* Accordingly, the scope of judicial review of an administrative rule, regulation, or policy is generally limited to

a determination whether that rule is arbitrary, capricious, unreasonable, or beyond the agency's delegated powers. *Id.* at 477, 476 *A.*2d 784; *New Jersey Ass'n of Health Care Facilities v. Finley,* 83 *N.J.* 67, 79, 415 *A.*2d 1147 (1980). Further, agency regulations are accorded a presumption of reasonableness; the burden is on the party contesting the regulations at issue to overcome those presumptions. *Bergen Pines, supra,* 96 *N.J.* at 477, 476 *A.*2d 784.

■ The Appellate Division invalidated the amendment to *N.J.A.C.* 8:31B–3.51(b)(4) on the ground that "[i]t would not be realistic for any hospital to select the 'not accept' option, because the losses associated with that choice will never be offset by a successful appeal." 227 *N.J.Super.* at 392, 547 *A.*2d 721. We are unable to conclude on this record that a hospital that elected to "not accept" its rates could not ultimately benefit from the appeal process.

The Department maintains that the reimbursement system contemplated by the Act is intended to be prospective and revenue-based; that the Legislature envisioned that the Department of Health would move toward fixing a "certified revenue base" for each hospital, to act as a budget that remains in place for a number of years with only routine periodic adjustments for inflation or other extraordinary factors; and that the regulations in question, which are intended to discourage appeals not likely to produce a benefit greater than the one-percent incentive provided to hospitals that accept their rates, are consistent with the development of a prospective-reimbursement system.

Under *N.J.A.C.* 8:31B–3.51(b)(4), as amended, a hospital may appeal for costs associated with an expansion of its GME program only under the "not accept" option. Concededly, adverse financial consequences are attached to appeals under that option, *i.e.,* recalculation of the preliminary cost base on the efficiency standard; addition of an "overspending challenge"; and reopening of the entire budget for review. The

financial disincentives attendant to election of the "not accept" option are intended to discourage hospital appeals of proposed reimbursement rates. Presumably, the Department's assumption is that a hospital ordinarily would not elect to appeal under that option unless the benefits to be anticipated from a successful appeal significantly outweigh the regulatory disincentives.

We cannot find such a regulatory scheme to be facially defective unless it has rendered illusory the statutory right to appeal rate-reimbursement issues. This record does not demonstrate, however, that the adverse financial consequences of appealing under the "not accept" option could not be offset by a successful appeal. Warren acknowledged at oral argument that although a hospital choosing to appeal under the "not accept" option would be likely to experience a significant reduction in its rate-year budget, a successful appeal under that option could provide net increases in a hospital's budget in subsequent rate years. In the absence of a challenge to the regulation as applied, based on evidence demonstrating that a hospital electing to "not accept" its rates cannot benefit over time by a successful appeal, we find the regulation to be facially valid, and not inconsistent with the statutory goal of providing quality health care at a reasonable cost.

In determining whether the promulgation of a particular regulation is within the agency's authority, a court "may look beyond the specific terms of the enabling act to the statutory policy sought to be achieved by examining the entire statute in light of its surroundings and objectives, in order to ascertain whether the requisite authority may be said to be implicitly supplied." *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562, 384 *A.*2d 795 (1978). The amendment to *N.J.A.C.* 8B:31–3.51(b)(4) encourages hospitals to operate within their approved revenues rather than seek increases through the appeals process. That goal is legitimate, and is consistent with the legislative intention to establish a truly prospective rate-setting scheme. We conclude that the

Department, in amending *N.J.A.C.* 8B:31–3.51(b)(4), acted within its delegated authority to establish a coherent, prospective system of hospital rate-setting.

The Appellate Division declined to rule on the validity of the amendments to *N.J.A.C.* 8:31B–3.31, which essentially provide that a hospital will be unable to move to a higher peer-group status despite the addition of graduate-medical-resident positions by transfer. As noted, those amendments were enacted in response to the task force report, which recommended institution of a one-year moratorium on the addition of residency positions and the AGMEC report, which identified problems with the system of classifying hospitals into peer groups based on teaching status. Because the validity of that regulation is not before us, we need not address it. We note, however, that the amendments adopted subsequent to the Appellate Division's decision have ameliorated, to some extent, the seemingly-severe impact of the regulation. See *N.J.A.C.* 8:31B–3.31(c); *N.J.A.C.* 8:31B–3.22 to –3.24.

Judgment reversed.

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, and GARIBALDI join in this opinion.

*For reversal*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—NONE.