NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-5266-07T3
             A-5271-07T3
             A-5990-07T3
             A-5993-07T3

IN THE MATTER OF ADOPTION OF
AMENDMENTS TO THE NORTHEAST,
UPPER RARITAN, SUSSEX COUNTY
AND UPPER DELAWARE WATER
QUALITY MANAGEMENT PLANS TO
ESTABLISH TOTAL MAXIMUM DAILY
LOADS IN THE NON-TIDAL PASSAIC
RIVER BASIN AND POMPTON LAKE/
RAMAPO RIVER ADDRESSING PHOSPHORUS
IMPAIRMENTS AND TO ESTABLISH
WATERSHED CRITERIA.

_____

> **APPROVED FOR PUBLICATION**
>
> **May 15, 2014**
>
> **APPELLATE DIVISION**

Argued June 2, 2009 — Remanded July 21, 2009
Reargued March 5, 2014 — Decided May 15, 2014

Before Judges Grall, Waugh, and Accurso.

On appeal from the New Jersey Department of
Environmental Protection.

Diane Alexander argued the cause for
appellants Pequannock, Lincoln Park &
Fairfield Sewerage Authority, Hanover
Sewerage Authority, and Madison-Chatham
Joint Meeting (Maraziti, Falcon & Healey,
L.L.P., attorneys; Ms. Alexander, of
counsel and on the briefs).

Robert A. Goodsell argued the cause for
appellant Warren Township Sewerage Authority
(Post, Polak, Goodsell, MacNeill &
Strauchler, P.A., attorneys; Mr. Goodsell,
of counsel and on the briefs; Alexa E.
Miller, on the briefs).

Jane F. Engel, Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Ms. Engel, on the brief).

William R. Lundsten argued the cause for respondent North Jersey District Water Supply Commission (DeCotiis, FitzPatrick & Cole, LLP, attorneys; Mr. Lundsten, of counsel; Kevin M. Kinsella, on the brief).

The opinion of the court was delivered by

WAUGH, J.A.D.

Appellants Pequannock, Lincoln Park and Fairfield Sewerage Authority (Two Bridges), Hanover Sewerage Authority (Hanover), Madison-Chatham Joint Meeting (Madison-Chatham), and Warren Township Sewerage Authority (WTSA) appeal the determination of respondent New Jersey Department of Environmental Protection (Department), following a remand[1] from this court, that it would be institutionally impracticable for respondent North Jersey District Water Supply Commission (North Jersey) to implement an as-needed-treatment program to limit the phosphorus content of effluent discharged into the Passaic River during the months between November and April. We affirm.

---

[1] In re Adoption of Amendments to the Ne., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, Nos. A-5266-07, A-5271-07, A-5990-07, and A-5993-07 (App. Div. July 21, 2009).

We discern the following facts and procedural history from the record on appeal.[2]

In 2008, the Department adopted amendments to its Northeast, Upper Raritan, Sussex County, and Upper Delaware Water Quality Management Plans (WQMPs). Those amendments established total maximum daily loads (TMDLs) limiting the amount of phosphorus, a nutrient that contributes to the growth of algae, discharged into the Passaic River. Appellants collect municipal wastewater for treatment, after which they discharge the treated water into the Passaic River.[3]

In 1987, the Department issued a special report, entitled "Passaic River Water Quality Management Study," which recommended that a detailed nutrient study be conducted to determine the maximum amount of phosphorus that sewage treatment plants should be allowed to discharge into the Passaic River. The Department subsequently adopted interim standards for the phosphorus content of effluent discharged into the river and

---

[2] We incorporate by reference the more detailed factual, procedural, and statutory background contained in our earlier opinion.

[3] We note that, as of the date of oral argument, none of the appellants have even constructed the facilities necessary to treat the phosphorus level of their effluent. The manner in which those facilities are constructed does not depend on the outcome of this appeal.

A-5266-07T3

undertook extensive studies to determine appropriate long-term standards. That process included studies by a private consulting firm and a panel of academics, comments by technical and public advisory committees, and public hearings. In April 2008, the Department adopted the WQMPs at issue in this appeal.

Appellants filed separate appeals, challenging aspects of the WQMPs. We consolidated the appeals. Appellants argued that the Department was arbitrary and capricious in requiring them to comply with the stringent limitations on the phosphorus content of their effluent during times of the year when daily adherence to such limitations is not necessary to maintain water quality in the waterways located downstream from their facilities, particularly the location from which the Wanaque Reservoir, operated by respondent North Jersey, diverts water to replenish the reservoir. Instead, they argued that the quality of water in the Wanaque Reservoir could be maintained adequately if the Department only required strict compliance from May through October, with treatment at other times on an as-needed basis. During the off-season, from November to April, appellants contend compliance should be required only when North Jersey actually anticipates diverting water from the Passaic River into the Wanaque Reservoir. They asserted that off-season diversion occurs infrequently and can be scheduled sufficiently in advance

A-5266-07T3

to permit dischargers to reduce their effluent to the required phosphorus standard. The Department had rejected that approach during the WQMPs adoption process, taking the position that "[t]ying effluent limits to an unpredictable pumping regimen outside the control of the regulated entity is institutionally impracticable." 40 N.J.R. 2574(b) (May 19, 2008).

In our earlier opinion, we observed that the Department had not explained what it meant by "institutionally impracticable" and noted that the extensive documentary record supporting adoption of the stringent discharge limitations did not address that issue. In re Adoption of Amendments to the Ne., Upper Raritan, Sussex Cnty. & Upper Del. Water Quality Mgmt. Plans, supra, Nos. A-5266-07, A-5271-07, A-5990-07, and A-5993-07 (slip op. at 12). We concluded that

> the feasibility of generally requiring adherence to those limitations only from May through October depends on the answer to two questions. First, how long in advance can North Jersey reasonably be expected to know of the need for an off-season diversion? Second, how much advance notice of a proposed diversion will appellants and other dischargers require in order to bring the level of phosphorus in their effluent into compliance with the new strict phosphorus limitations during the off-season?
>
> [Id. (slip op. at 13).]

Consequently, we remanded for an evidentiary hearing to address those questions, but upheld the validity of the WQMPs amendments in all other respects. We retained jurisdiction.

On remand, the Department transferred the matter to the Office of Administrative Law (OAL) for an evidentiary hearing. Following some motion practice not involved in this appeal,[4] the administrative law judge (ALJ) issued a pre-hearing order that provided for all testimony to be pre-filed, with the hearing limited to cross-examination and redirect-examination. The hearing took place on seven days between May 20 and December 17, 2010.

With respect to the first question, how far in advance North Jersey can reasonably be expected to predict the need for an off-season diversion of water from the Passaic River to the Wanaque Reservoir, the parties presented three witnesses: Dr. Pen C. Tao, manager and hydrologist of North Jersey's Source Water Management and Planning Department on behalf of North Jersey; Richard D. Grabowski, the Department's Supervising Environmental Specialist in the Division of Water Supply, Bureau

---

[4] The Department objected to appellants' demands for certain water quality data used in developing the TMDLs and moved to limit discovery. The ALJ granted the motion. The Commissioner denied interlocutory review, and we denied leave to appeal. The ALJ also granted the Department's motion to join North Jersey as an indispensable party. North Jersey sought interlocutory review of that order, which the Commissioner denied, as did we.

of Water Allocation on behalf of the Department; and Les K. Lampe, a licensed professional engineer and Vice President of Black and Veatch in its Water Resources Global Practice and Technology Leader Department on behalf of appellants.

On the second issue, how much advance notice of a diversion is required for dischargers to bring their effluent into compliance with the required phosphorus limitations, the parties presented six witnesses: Jurek Patoczka,[5] licensed professional engineer with Hatch Mott MacDonald on behalf of WTSA; Robert N. Bongiovanni, the Executive Director of Two Bridges; Robert Rectanus,[6] senior engineer with Black and Veatch, the consulting engineering firm retained by Two Bridges to develop a plan for compliance with the TMDLs; Louis T. Barry, a licensed professional engineer with Chavond-Barry Engineering, consultants to Two Bridges; Timothy D. Bradley, a licensed professional engineer and the Director of Wastewater Practice for Omni Environmental, consultants to Madison-Chatham; and Michael Wynne, Executive Director of Hanover.

---

[5] Please note that Patoczka's name is misspelled as "Uri Petaska" in the transcript.

[6] Please note the Rectanus's last name is misspelled as "Retanis" in the transcript.

A-5266-07T3

With respect to the time it takes "a clean drop of water" to travel from the WTSA treatment plant to the confluence of the Passaic River with the Pompton River, Patricia Kehrberger, an expert in water quality modeling and evaluation, testified for WTSA; and Hui Pang, an expert in investigation and modeling of the transport of pollutants in river and lake systems, testified for the Department. Pilar Patterson, Bureau Chief of the Department's Bureau of Surface Water Permitting, testified about the time required for dischargers to sample and demonstrate compliance with the applicable TMDLs limit.

Barbara Hirst, Chief of the Department's Bureau of Environmental Analysis and Restoration within the Division of Watershed Management, testified concerning the Department's earlier rulemaking decision. Richard T. Dewling, a licensed professional engineer and President of Dewling Associates, Inc., testified on behalf of appellants that there was no scientific or technical basis for requiring phosphorus to be removed in the winter months when water is not diverted to the Wanaque Reservoir.

In her decision, the ALJ summarized the testimony of the seventeen witnesses presented by the parties, all of whom were qualified as experts in their fields. She determined that at the time the amended WQMPs were adopted there had been no

objective substantiation of the Department's conclusion that conditional off-season limitations were "institutionally impracticable."

Based upon her review of the historic records, the ALJ found that, in the years 2000 to 2009, North Jersey diverted water from the Passaic River during winter months on only six occasions that would have required dischargers to commence treatment if an off-season, as-needed treatment program had been in place. Four of those occasions would have involved a temporary period of phosphorus treatment, while two would have necessitated only an early resumption of the regular summer treatment schedule. In the earlier period of 1990 to 1999, North Jersey diverted water from the Passaic River during winter months on only five occasions, four of which would have required temporary treatment. The other would have been an early resumption of regular treatment.

The ALJ concluded that North Jersey is capable of predicting most of the conditions requiring diversions fourteen days or more in advance. She noted that the "real time" conditions have not been significant to the pumping decisions historically. She found that North Jersey is capable of notifying the Department and dischargers of potential diversions two weeks in advance of any actual diversions. She further

concluded that a fourteen-day notice requirement prior to any water diversion would not lead to a disastrous water supply shortfall in the northeastern region of New Jersey.

Because North Jersey would exercise the sole discretion as to when to initiate pumping events, the ALJ concluded that it could build extra time into the notice period, thereby assuring that the stricter phosphorus levels would be attained prior to pumping. The dischargers would then be required to continue treatment until North Jersey advised them that it was no longer required.

Based on her evaluation and weighing of the scientific evidence presented at the hearing, the ALJ concluded that dischargers, including appellants, have sufficient information about their own wastewater treatment processes, waste stream, and chemical additives to enable them to resume the required level of treatment when necessary to treat effluent prior to an off-season diversion by North Jersey. She further concluded that the scientific evidence adduced at the hearing supported the conclusion of several experts, to a reasonable degree of certainty in their fields of expertise, that dischargers that do not utilize ponds in their treatment systems can re-achieve the required monthly average level of phosphorus within five days of initiating increased treatment. Dischargers with aeration or

10

polishing ponds would need additional time, corresponding to the number of days it takes the treated effluent to transit and exit the pond.

The ALJ further concluded that appellants and other upstream dischargers can comply with monitoring, testing, and other reasonable conditions imposed by the Department incidental to implementation of an off-season, as-needed treatment program. In the event a discharger is unable to comply, the ALJ noted that the non-compliant discharger could be required to treat on a year-round basis.

The ALJ found that year-round treatment would result in use of public resources for unnecessary introduction of chemicals into the Passaic River and the production of additional sludge requiring disposition. However, the ALJ also concluded that the economic impact of year-round phosphorus treatment, even though that treatment might be unnecessary for seventy-five percent or four-and-one-half months of the winter season, had not been demonstrated to be significant.

The ALJ reached five final conclusions. First, the Department failed to make a diligent inquiry into the feasibility of an off-season, as-needed treatment program in initially adopting the revised WQMPs for the Passaic River Basin. Second, such an off-season, as-needed treatment program

11

is feasible given the current wastewater treatment technology, assuming reasonable cooperation among the agencies involved. Third, the costs of year-round phosphorus treatment would not place a significant fiscal burden on upstream wastewater treatment facilities. Fourth, an off-season, as-needed treatment program would be environmentally protective of the Wanaque Reservoir and its supply of safe drinking water and at least environmentally neutral with respect to the Passaic River and byproducts of the use of unnecessary chemicals. Fifth, the Department has the necessary authority to implement the proposed as-needed program.

The Commissioner rejected the ALJ's ultimate conclusion. Instead, he concluded that implementation of such a treatment program is institutionally impractical. He explained his reasons in a detailed twenty-two page final decision. The Commissioner forwarded his remand decision to the clerk in July 2012, after which we allowed the parties to submit additional briefs.

## II.

Appellants challenge the Commissioner's rejection of the ALJ's conclusion that an off-season, as-needed treatment program is institutionally feasible and argue that he improperly rejected or ignored the ALJ's findings and conclusions.

A.

Our scope of review of an administrative agency's final determination is limited. In re Carter, 191 N.J. 474, 482 (2007). A court may reverse only if it "conclude[s] that the decision of the administrative agency is arbitrary, capricious, or unreasonable, or is not supported by substantial credible evidence in the record as a whole." J.D. v. N.J. Div. of Developmental Disabilities, 329 N.J. Super. 516, 521 (App. Div. 2000); see also Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988); Outland v. Bd. of Trs., 326 N.J. Super. 395, 399 (1999). We accord a "strong presumption of reasonableness" to an agency's "exercise of statutorily delegated responsibilities." City of Newark v. Natural Res. Council, 82 N.J. 530, 539, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div.), certif. denied, 188 N.J. 219 (2006).

Our limited standard of review of administrative agency decisions is informed by three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial

A-5266-07T3

> evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Mazza v. Bd. of Trs., 143 N.J. 22, 25 (1995).]

Where an agency's expertise is a factor, a court defers to that expertise, particularly in cases involving technical matters within the agency's special competence. In re Freshwater Wetlands Prot. Act Rules, 180 N.J. 478, 488-89 (2004).

"[J]udicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to . . . deal[] with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues . . . .'" N.J. State League of Municipalities v. Dep't of Cmty. Affairs, 158 N.J. 211, 222 (1999) (quoting Bergen Pines Cnty. Hosp. v. N.J. Dep't of Human Servs., 96 N.J. 456, 474 (1984)). "'[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs.'" Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001) (citation and internal quotation marks omitted) (quoting In re Vineland Chem. Co., 243 N.J. Super. 285, 307 (App. Div.), certif. denied, 127 N.J. 323

(1990)). The court "may not vacate an agency determination because of doubts as to its wisdom or because the record may support more than one result," but is "obliged to give due deference to the view of those charged with the responsibility of implementing legislative programs." In re N.J. Pinelands Comm'n Resolution PC4-00-89, 356 N.J. Super. 363, 372 (App. Div.) (citing Brady v. Bd. of Review, 152 N.J. 197, 210 (1997)), certif. denied, 176 N.J. 281 (2003).

In reviewing administrative adjudications, an appellate court must undertake a "careful and principled consideration of the agency record and findings." Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n, 98 N.J. 458, 468 (1985). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Clowes, supra, 109 N.J. at 588. If, however, our review of the record leads us to conclude that the agency's finding is clearly erroneous, the decision is not entitled to judicial deference and must be set aside. L.M. v. Div. of Med. Assistance & Health Servs., 140 N.J. 480, 490 (1995). We may not simply rubber stamp an agency's decision. In re Taylor, 158 N.J. 644, 657 (1999).

An ALJ's factual findings and legal conclusions are not "binding upon [an] agency head, unless otherwise provided by statute." N.J.A.C. 1:1-18.1(c). Accordingly, an agency head reviews an ALJ's decision "de novo . . . based on the record" before the ALJ. In re Parlow, 192 N.J. Super. 247, 248 (App. Div. 1983).

An agency head may only reject the ALJ's credibility findings after he or she "determine[s] from a review of the record that the findings are arbitrary, capricious or unreasonable or are not supported by sufficient, competent, and credible evidence in the record." N.J.S.A. 52:14B-10(c). However, the limitation in N.J.S.A. 52:14B-10(c) does not apply to the testimony of expert witnesses. ZRB, L.L.C. v. N.J. Dep't of Envtl. Prot., 403 N.J. Super. 531, 561 (App. Div. 2008); see also Cavalieri v. Bd. of Trs., 368 N.J. Super. 527, 533-34 (App. Div. 2004); S.D. v. Div. of Med. Assistance & Health Servs., 349 N.J. Super. 480, 485 (App. Div. 2002).

B.

Applying our limited scope of review to the remand decision in light of the record on appeal, the ALJ's decision, and the applicable law, we conclude that the result reached by the Commissioner is not arbitrary, capricious, or unreasonable, and

16                                                          A-5266-07T3

that it is supported by substantial credible evidence in the record as a whole.

The decision at issue involves the enforcement of important water quality statutes intended to improve the quality of drinking water in the covered area through treatment to reduce the amount of phosphorous and then to maintain that improved quality. The Department, because of its expertise in the field of environmental protection, has been tasked with the responsibility of implementing and enforcing the new requirements for the benefit of the public. As noted above, we are required to defer to an administrative agency's expertise, particularly in cases involving technical matters within the agency's special competence. Freshwater Wetlands, supra, 180 N.J. at 488-89. That deference is clearly applicable in this case. And, as with any review of an administrative action, the issue is not whether we would have reached the same result, but whether the result reached by the Commissioner is "arbitrary, capricious, or unreasonable, or is not supported by substantial credible evidence in the record as a whole." J.D., supra, 329 N.J. Super. at 521.

As we suspected in our initial opinion, the ALJ determined that the Department's initial rejection of appellants' proposal for off-season, as-needed treatment was not based on any

significant study or consideration of the issue. To that extent, it was arbitrary and not supported in the record. Our remand was for the express purpose of requiring such a study, to be focused on the time "reasonably" required by North Jersey to predict the need for a diversion of water to the Wanaque Reservoir and the lead time required by upstream dischargers, such as appellants, to decrease their effluent to the required phosphorus level.

The Commissioner concluded that the ALJ improperly shifted the focus of the remand by approaching the analysis from the perspective of whether North Jersey can "wait out" the time it would take appellants and other dischargers to bring their effluent into compliance with phosphorus limits, thereby requiring North Jersey to alter its mode of operations. We agree with that assessment to the extent that the ALJ appears to have placed the burden on North Jersey to demonstrate that it cannot and should not be required to change its way of operation to accommodate an off-season, as-needed treatment program.

North Jersey's Tao took the position that diversion decisions needed to be made in as little as two days, depending on then-existing "real-time" circumstances. The ALJ questioned that assertion. To a significant extent, the ALJ's skepticism was based on Lampe's testimony that a diversion prediction could

A-5266-07T3

be made much further in advance. Tao's testimony was a mixture of fact and expert testimony, but his opinion was based on his historical experience at North Jersey, along with his anticipation that, once the water quality has been improved, North Jersey would make more frequent diversions of water for shorter durations than in the past, and his acknowledged expertise in the field. Lampe's testimony was based on models and experience with treatment in other locations, rather than actual experience concerning the Wanaque Reservoir.

We are satisfied that the Commissioner's decision to accept Tao's opinion rather than Lampe's was not arbitrary or capricious. It is adequately supported in the record, especially given the Department's expertise. Even if the ALJ was correct that Tao's two-day estimate is sometimes too low, we conclude that there are sufficient facts in the record to support the Commissioner's rejection of the ALJ's conclusion that North Jersey could reasonably predict the need to divert water significantly longer in advance, particularly given Tao's desire to transition to more frequent, but less prolonged, periods of diversion.

The Commissioner also rejected the ALJ's conclusions concerning the time necessary for dischargers to bring the quality of their effluent to the required level prior to a

diversion. He observed that the ALJ's conclusion was based primarily on Patoczka's testimony that it would take five days to do so, testimony the Commissioner found inconsistent with that of other witnesses whose opinions he found more reliable, including Wynne, Rectanus, and Bradley. The Commissioner also noted that Patoczka had not even distinguished between facilities with and without finishing ponds, a factor found significant by the ALJ. Based on his weighing of the expert testimony and other evidence, the Commissioner concluded that it would take at least seven days advance notice, with several additional days for facilities using finishing ponds, for dischargers to treat their effluent to the required level.

The Commissioner further rejected the ALJ's conclusion that there would be sufficient time for dischargers to test the water quality adequately after treatment but prior to diversion by North Jersey. In doing so, he relied on Patterson's testimony that it takes a minimum of twenty-eight hours for a discharger with an on-site certified laboratory and typically about four days for a discharger without an on-site laboratory, although some can take as long as ten days. Bradley testified that for facilities without on-site laboratories, it takes one week to get printed results back from a laboratory, and expedited review takes about half that time. Relying on N.J.A.C. 7:14A-14.2,

table 14-1, which requires composite samples for major dischargers to demonstrate compliance, the Commissioner declined to accept the ALJ's finding that one sample would be sufficient to demonstrate that the level of compliance had been achieved. Finally, the Commissioner concluded that an off-season, as-needed treatment program would impose significant burdens on the Department, including a need for additional staff.

Our review of the record convinces us that the Commissioner's conclusions were not arbitrary or capricious, and that they are amply supported in the record. Like the issue of North Jersey's ability to predict the need for diversion, the time-to-treat issue implicates the Department's expertise. The Commissioner's decision to give more weight to the opinions of experts other than those favored by the ALJ is an exercise of that expertise. Because the Commissioner's choice finds significant support in the record, his decision was not arbitrary or capricious.

Having upheld the Commissioner's determination that North Jersey cannot reasonably be expected to give significant advance notice of a diversion and that the dischargers cannot reasonably be expected to bring their effluent to the required standard, including time required for testing within the time reasonably required by North Jersey, we find that the Commissioner's

21                                          A-5266-07T3

conclusion that an off-season, as-needed treatment program is "institutionally impracticable" is not "arbitrary, capricious, or unreasonable," nor is it "[un]supported by substantial credible evidence in the record as a whole." J.D., supra, 329 N.J. Super. at 521. Especially on a question involving the quality of drinking water, our obligation to defer to the Department's special expertise, Freshwater Wetlands, supra, 180 N.J. at 488-89, permits no other result on the record before us.[7]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] As noted at the beginning of our opinion, the appellants have not built the required facilities and, of necessity, have not started treatment. Once the treatment program has actually been in operation for several years and there is actual experience concerning North Jersey's needs and timing of diversion, appellants can seek to revisit the viability of an off-season, as-needed treatment program.

A-5266-07T3