**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0936-19

THE DEVEREUX
FOUNDATION,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND
WORKFORCE
DEVELOPMENT,

     Respondent-Respondent.

_____

          Argued April 27, 2021 – Decided May 25, 2021

          Before Judges Haas, Mawla, and Natali.

          On appeal from the New Jersey Department of Labor and Workforce Development, Docket. No. 13-053.

          Peter L. Frattarelli argued the cause for appellant (Archer & Greiner, PC, attorneys; Peter L. Frattarelli and Daniel J. DeFiglio, on the briefs).

          Rimma Razhba, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney

General, attorney; Jane C. Schuster, Assistant Attorney
General, of counsel; Rimma Razhba, on the brief).

PER CURIAM

Petitioner the Devereux Foundation (Devereux) appeals from a September 26, 2019 Final Administrative Action of the Commissioner of the Department of Workforce and Labor (the Department), finding Devereux responsible for contributions under the New Jersey Unemployment Compensation Act, N.J.S.A. 43:21-1 to -24.4, (UCL), between 2002 and 2005. We affirm.

We take the following facts from the record, which includes a hearing before an administrative law judge (ALJ), whose decision the Department reversed. Devereux is self-described as a "national non-[]profit agency that provides treatment services to individuals, children, families, adolescents, and adults with special needs, behavioral health, mental health, and developmental disabilities." Devereux places children in therapeutic foster homes which serve as short-term living solutions for minors. The homes are owned and occupied by families who contract with it to serve as therapeutic foster parents.

New Jersey received a federal grant, and beginning in 1999, contracted with Devereux to develop a pilot program for Devereux "to recruit families and to train them and to . . . provide oversight to work with kids who were referred through the System of Care to the . . . program." The program works with

children and adolescents with "a history of aggression, . . . trauma, . . . abuse and neglect, . . . substance abuse[,] . . . suicidal behavior, . . . [or running] away from home."  After a child is placed in a home, Devereux "provide[s] oversight, . . . support, . . . always ha[s] a staff member on call seven days a week, [twenty-four] hours a day[] in case there [is] an emergency[,] and . . . ensure[s] that the family [is] adhering to the State regulations . . . ."  As part of the oversight process, Devereux staff visit the homes once per week.  According to Devereux, during placement, it has "'no right of control' over the therapeutic foster parents, other than to ensure compliance with State regulations."

Devereux "bills the State on a 'fee for service' basis, and receives a non-negotiable . . . amount of money 'based on the number of children' placed with therapeutic foster parents."  Fifty percent of that is paid to the parents on a "[p]er diem, per child" basis "[t]o reimburse them for costs associated with caring for the kids."  The reimbursement pays for the child's "allowance," food, utilities, and other expenses for the home, all of which is set by State regulations.  The rest of the money is used for Devereux's overhead.

Devereux cannot compel a parent to accept a placement.  A foster family can "reject a placement for any reason, including that the family is not equipped

to handle that child's behavior." During the 2002 to 2005 audit period, Devereux issued therapeutic foster parents Internal Revenue Service 1099 forms (1099s).

Devereux utilized "contractors" to repair and maintain its group homes because it did not have a maintenance crew and issued these repairpersons 1099s. The number of repairpersons hired fluctuated from year-to-year as did the compensation Devereux paid. Between 2002 and 2005, Devereux issued approximately fifty-five 1099s, twelve of which reflected compensation exceeding $5,000, and twenty-two for less than $1,000.

Devereux also hired medical service providers, including mental health professionals, to treat children during their placement. These individuals signed "Independent Contractor Agreements" and their compensation was reflected in 1099s issued by Devereux. The number of medical providers paid by Devereux fluctuated as did their compensation.

Michael Bartholomew conducted the relevant audits on behalf of the Department. Because Bartholomew subsequently retired, Alan Handler, a Redetermination Auditor, testified in this matter on behalf of the Department. The audit was triggered when Evangeline Edwards, an agent of Devereux, "issued a 1099 to [Dennis Guyton] who [then] tried to collect [d]isability

4

benefits."  According to Bartholomew's review of Guyton's tax returns[1], he earned between ninety-six and one hundred percent of his income from Edwards between 2002 and 2004.  Bartholomew's audit expanded to numerous other individuals, whom he noted were "foster care helper[s]" who "help[ed] the foster care parents handle the children in their home."  Bartholomew concluded as follows:

> Examination and documentation disclosed the following . . . :
>
> 1.  The individuals are under the direction and control of the employer.  The employer hires the individuals, schedules their work hours and is responsible for the quality of their work.
>
> 2.  The individuals perform their services at the employer[']s location and they perform services which are in the usual course of business.
>
> 3.  The individuals do not have an established business providing these services to the public.  They did not advertise, have a business telephone listing or a permanent place of business.
>
> Based on the above[,] the individuals are deemed to be in covered employment as they did not meet the provisions of [N.J.S.A. 43:21-]19(i)(6)(A)[, ](B)[, and] (C).

---

[1] Guyton's tax returns identified him as a "[t]eaching parent."

A-0936-19

Following the Edwards audit, Bartholomew audited Devereux itself and concluded as follows:

> Employer is a Not-For-Profit Corporation that provides treatment programs for emotional, behavioral[,] and developmental disabilities. The employer paid individuals as subcontractors to provide the following services[:] repair and maintenance, foster care[,] and mental health services.
>
> . . . .
>
> . . . Examination and documentation disclosed the following. . . .
>
> > 1. The individuals providing maintenance services and mental health services were under the direction and control of the employer. They were instructed as to when and where to perform the services. The individuals who were paid as foster care parents were assigned a consultant to oversee compliance with established criteria.
> >
> > 2. The individuals who provided services as foster care parents and mental health workers were performing services which are in the usual course of business. The employer is in the business of providing mental health services.
> >
> > 3. The individuals did not have established businesses providing these services to the public. They did not advertise[,] have a business telephone listing[,] or a

6

permanent place of business. Foster care parents are restricted from taking any placement from any other foster care organization while they are under contract with Devereux.

Based on the above[,] the individuals are deemed to be in covered employment as they did not meet the provisions of [N.J.S.A. 43:21-]19(i)(6)(A)[, ](B)[, and] (C).

Bartholomew concluded Devereux underreported contributions per N.J.S.A. 43:21-19(g) and (i)(6) for the second quarters of 2002 through 2005, resulting in a deficit of $77,561.95, which the Department assessed to Devereux. Handler testified his independent review of the audit led him to the same conclusion.

In a written decision, the ALJ reversed the Department's assessment, finding N.J.S.A. 43:21-19(i)(6)(A), (B) and (C) did "not apply to Devereux's foster care providers, mental health personnel[,] and repair[persons]" because Devereux did not pay remuneration to the foster parents. The ALJ also predicated the decision on the conclusion "Bartholomew, his supervising auditor or either of the referring agencies" did not testify, and therefore Bartholomew's report was hearsay. The ALJ rejected Handler's testimony because he "did not oversee [t]he Bartholomew audit . . . [and] merely reviewed the documents included in Bartholomew's reports . . . [and he] did not know what books or

records Bartholomew reviewed in preparation of his report" and Handler never met with Bartholomew or his supervisor to discuss the report. "Furthermore, Handler admitted that the spreadsheets included with Bartholomew's reports were not the New Jersey Department of Labor (NJDOL) standard forms and he did not know who created them."

The balance of the ALJ's opinion, which we need not discuss in detail here, applied N.J.S.A. 43:21-19(i)(6)(A), (B) and (C), known as the ABC test, to the foster parents and concluded Devereux had met all three prongs of the test and was not responsible for the assessment. The ALJ did not conduct a similar analysis for the repairpersons or the mental health providers.

The Department filed exceptions to the ALJ's decision. The matter was heard by the Commissioner of the Department who issued the September 26, 2019 final agency decision reversing the ALJ and upholding the assessment. The Commissioner rejected the ALJ's finding the audit report was hearsay, noting "administrative proceedings do not follow the stricter evidentiary rules of [the] Superior Court," and the ALJ had "ignored several important indicia of reliability." The Commissioner found as follows: the audit conducted and the records gathered by Bartholomew were in the normal course of the auditing process; the records were provided by Devereux and the audited providers who

did not question their reliability; Handler had gathered his own information and conducted his own review of Bartholomew's audit, drawing his own conclusions; the spreadsheets prepared by Bartholomew were self-explanatory and the fact they were not on the Department forms "should not rob them of their obvious probative value."

Contrary to the ALJ's findings, the Commissioner concluded the payments made by Devereux to the foster parents constituted remuneration under the UCL. At the outset, the Commissioner noted the facts of Lester A. Drenk Behavioral Health Center v. New Jersey Department of Labor and Workforce Development, No. DOL 06-002, 2007 N.J. AGEN LEXIS 592 (May 25, 2007), a case in which an ALJ found an employment relationship between a non-profit behavioral health center and therapeutic foster care parents, was similar to Devereux's case.

For example, both programs operated "through a contract with the State[,] with the company then entering into a subcontract with families" which "passe[d] State requirements on to the providers"; the therapeutic foster care parents were "primary caregivers, with intensive supervision plans established by a care management team,"; and the parents "utilize[d] some independent judgment and must exercise independent judgment as a parent, nevertheless they were not free of direction and control by" the programs because of similar

A-0936-19

agreements.  The <u>Drenk</u> ALJ found it was "'clear' that the therapeutic foster care providers 'were paid by Drenk for services rendered in performing therapeutic foster parenting services to children in need'" plus basic expenses of raising a child.

The Commissioner differentiated the Devereux therapeutic foster homes from typical foster homes by citing the following:  Devereux's website; a treatment home contract; an independent contractor agreement; a handbook for a treatment home program; and an advertisement for a family care program—all of which touted or explained the therapeutic services provided in the foster homes.  The Commissioner concluded the "therapeutic foster care providers were doing far more than just providing children with a safe and nurturing environment . . . [and] actively provided critical therapeutic services to children and adolescents with medical, psychological, social, and emotional needs," such as "helping to create a care plan; implementing a broad training curriculum to help the children develop skills[,] . . . and teaching the children these skills directly and by example . . . ."

The Commissioner described six examples of the therapeutic model in the record as follows:

> For example, an item from the Devereux website
> explains that therapeutic foster care providers "actually

serve as primary treatment facilitators, teaching directly and by example" and "incorporate individual, group and milieu therapies, as well as psychiatric services, speech therapy, medical and nutritional interventions, and pre-vocational training" to "help these youth modify their behavior so they can return to their own communities or independent living." In the therapeutic foster care provider agreement between Devereux and the Edwards family, it is specified that the family "provide a therapeutic family environment for child/adolescent clients placed by Devereux to help the clients to achieve their individualized treatment goals." The key concept here is "therapeutic" family environment – the therapeutic foster care providers are doing more than just ensuring that the children are fed and clothed properly, they are teaching the children "directly and by example . . . to modify their behavior." To this end, the Edwards family was required to "document observations of the client's behavior and the therapeutic responses to the behavior on a daily basis." The family was also required to "implement the home-based treatment strategies of the client's ISP [Individualized Service Plan] and/or JCR [Joint Care Review]."

As another example, in the 2006-2007 Devereux treatment home contract, it states that therapeutic foster care providers function as a team "to provide services for individuals in the home," including "elements from a variety of different positive behavioral health based treatment models." The contract further states that therapeutic foster care providers, acting as teachers, "will implement a broad curriculum of skill training that will enable the individuals to develop in many areas so they may achieve their maximum potential and become productive members of society." These skills include "self-care, family living, independent living,

academic skills, social skills, pre-vocational and vocational skills, self-control, [and] recreation."

As a third example, in an addendum to the 2003 independent contractor agreement between Devereux and Joan Perry, it states that therapeutic foster care providers "provide services utilizing the treatment methods of the Devereux Family Care Program" and "will teach the children a broad curriculum of skills that will enable the children to achieve their maximum potential and be reunited with their families in as short a time as possible." Pursuant to an individualized service plan, Perry was required to "teach the child social, academic, and daily living skills," "improve the child's ability to cope with problems in socially acceptable ways," and "improve the child's ability to develop positive relationships with adults and peers." Perry was further required to "implement a broad curriculum designed to teach the child new skills" in the areas of self-care, pre-vocational and vocational skills, academic skills, social skills, independent living, recreation and leisure, family living, self-control, and problem solving skills. Substantially similar requirements are included in Perry's 2004 and 2005 independent contractor agreement as well.

As a fourth example, in Devereux's handbook for its treatment home program, it instructs therapeutic foster care providers to "provide a family style living environment and teach the youth a broad curriculum of skills that will enable the youth to achieve their maximum potential." These skills include "concepts of personal space and appropriate boundaries;" social, academic, vocational, and self-care skills; and "alternatives to inappropriate behaviors and how to manage challenging behaviors." Therapeutic foster care providers become a member of the care team for each child, and must develop a treatment plan which

12

"identifies strengths and needs and goals and objectives" as well as "delineating each service the youth will receive in order to help them achieve their goals."

As a fifth example, in an undated advertisement for its Family Care program, Devereux indicated that it was "seeking caring adults to provide specialized services to children in the adults' own homes." As a sixth example, an undated press release announcing the opening of Devereux's Family Cam program stated that "the emphasis of the program is on teaching children the skills necessary for them to function effectively in their home and community."

The Commissioner concluded the ALJ "did not adequately consider the therapeutic services provided by therapeutic foster care providers to the children [and that t]he payments received from Devereux were clearly for both these therapeutic services as well as to cover the costs of housing the children." The Commissioner therefore concluded "the payments to the therapeutic foster care providers constituted remuneration under the UCL."

The Commissioner also found the repair persons and mental health professionals retained by Devereux received remuneration. He noted Devereux hired forty-six repairpersons "to perform maintenance and repairs on [Devereux's wholly owned or rented facilities throughout the State] during the audit period, and paid each of them via a 1099." Devereux also hired fourteen mental health professionals and similarly paid them via 1099s.

A-0936-19

Next, the Commissioner applied the ABC test to the foster parents, the repairpersons, and the mental health providers.

The Commissioner found the therapeutic foster parents followed State guidelines, provided a stable home with food and clothing, and "provided therapeutic services as needed in accordance with the goals and objectives set forth in the care management plan." Therefore, the Commissioner concluded Devereux did not meet part A of the ABC test and failed to establish the foster parent homes operated free from its control or direction.

The Commissioner found Devereux failed to meet part B of the ABC test. Relying on Drenk, the Commissioner found "the services provided by Devereux's therapeutic foster care providers are not outside of Devereux's usual course of business" because the parents' "private homes . . . [were] extensions of [Devereux's] place of business." Quoting Transworld Systems, Inc. v. New Jersey Department of Labor, the Commissioner found the "analysis of [part] B . . . must consider not only 'locations where the enterprise has a physical plant,' but also where the employer 'conducts an integral part of the business.'" No. DOL 96-039, 1998 N.J. AGEN LEXIS 661 at 6 (June 17, 1998). The Commissioner concluded "the essence of Devereux's business is to deliver therapeutic services in this way" and "[t]o hold otherwise would be to take an

unduly restrictive view of the realities of the relationship between Devereux and its therapeutic foster care providers."

The Commissioner found the ALJ "erroneous[ly] read[]" part C by holding the therapeutic foster parents have an "enterprise that exists and can continue to exist independently of and apart from the particular service relationship" merely because they must demonstrate another source of income separate from reimbursements as part of the licensing process. The Commissioner concluded outside sources of income are "not relevant" to part C, and the relevant inquiry was whether "they have outside sources of income from providing therapeutic services." He concluded Devereux failed to meet part C because there is "no evidence in the record to demonstrate [the foster parents] 'have an outside relationship with other entities to provide therapeutic foster-parenting services,' or were 'conducting their own independently established enterprises as providers.'"

Because the ALJ made no findings regarding the repairpersons, the Commissioner found the following facts: Devereux hired repairpersons because it did not have a maintenance crew; Devereux did not control the tools they used or the other individuals the repairpersons hired to help; Devereux verified they had insurance but did not sign subcontractor agreements because they "had

15

gotten burned several years ago with a litigation case on that"; Devereux did not "advance business expenses" to the repairpersons and did not "withhold any taxes or unemployment/disability contributions."

Citing <u>Carpet Remnant Warehouse, Inc. v. New Jersey Department of Labor</u>, 125 N.J. 567, 583-84 (1991), the Commissioner found Devereux failed to meet part A because it did not show the repairpersons were

> "free to choose where and when to work, including working for other brokers or independently;" that they were "not obligated to comply with any rules, practices, or procedures" set by Devereux; that the firm exercised no supervision over them; that the firm provided no training; that the firm provided no supplies, equipment, or uniforms; or that the firm provided no fringe benefits.

The Commissioner concluded Devereux met part B because "it [was] clear that the repair[persons] were not performing services in the usual course of Devereux's business, as the firm's business is not construction, maintenance, or repair."  However, the Commissioner concluded part C was not met, and citing <u>Carpet Remnant Warehouse</u>, noted "a key element of the Part C analysis . . . is whether the person providing services 'is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed.'"  He noted although the record contained only Schedule C tax forms "for a handful of the approximately [forty-six]" repairpersons, it showed they "received the

16

vast majority of their income from Devereux, which strongly indicates that they were not truly independent contractors." The Commissioner found that as to the other repairpersons whose Schedule Cs were not included in the record, there was "no evidence . . . to establish that they were customarily engaged in an independently established business, occupation or trade."

The Commissioner also made findings regarding the mental health providers. He noted the record contained only the independent contractor agreements between the mental health professionals and Devereux, which stated Devereux "'shall have no right to control or direct the details, manner or means by which [c]ontractor accomplishes' the contracted services" and testimony that Devereux "believed" the providers "had other business interests outside" of Devereux. The Commissioner found "[t]he mere presence of a signed independent contractor agreement does not end the ABC analysis" and citing Carpet Remnant Warehouse, concluded Devereux failed to show it did not control the mental health providers and therefore did not meet part A.

The Commissioner found Devereux failed to meet part B because the testimony indicated the providers "provided psychological evaluations of 'mostly folks in the group homes,' which were directly owned by Devereux, rather than in the private homes of foster parents." Therefore, the Commissioner

17

concluded the mental health providers worked in Devereux facilities. He also concluded "[b]ecause of Devereux's greater responsibilities in its group homes, including the need to provide relevant medical services, the services provided by these professionals would not be outside the usual course of business."

The Commissioner found "[t]he fact that these professionals had professional liability insurance, and may have had other business interests, [was] not enough to meet the [p]art C test." He noted the record contained only "a handful" of the fourteen mental health providers' Schedule Cs, all of which showed they "received the vast majority of their income from Devereux, which strongly indicates that they were not truly independent contractors." As to the Schedule Cs, which were not provided for the other providers, the Commissioner concluded there was "no evidence . . . to establish that they were customarily engaged in an independently established business, occupation or trade."

Devereux raises the following arguments on this appeal:

> [Point 1:] The Commissioner erroneously concluded that the ABC test applied to therapeutic foster parents.
>
> [Point 2:] Even if the ABC Test applies, the Commissioner's application of the ABC Test as the therapeutic foster parents was not supported by prior judicial decisions and would render existing judicial constraints meaningless.

[A.]    The Commissioner's decision conflates State licensing requirements with "control."

[B.]  The Commissioner's finding that each therapeutic foster parent's privately-owned home was . . . an extension of Devereux's business sets the "impossible standard" previously rejected in Carpet [Remnant] Warehouse.

[C.]  The Commissioner's conclusion that therapeutic parents must establish "outside sources of income from providing therapeutic services" is not an accurate statement of the law.

[Point 3:]  The State Has Failed to Prove Its Case With Respect To Repairs/Maintenance and Other Medical Providers.

I.

Appellate courts have a limited role in reviewing the decisions of administrative agencies.  We will not reverse an agency decision unless it is "arbitrary, capricious or unreasonable or is not supported by substantial credible evidence in the record as a whole."  . . . Moreover, decisions of administrative agencies carry with them a strong presumption of reasonableness particularly in the exercise of its statutorily-delegated responsibilities. . . . We cannot substitute our judgment for that of the agency.  . . . The burden of showing the agency's action was arbitrary, unreasonable, or capricious rests upon the appellant.  . . . If we find sufficient credible, competent evidence in the record to support the agency's conclusion, then we will uphold the agency's findings.

A-0936-19

> [Dep't of Ins. v. Universal Brokerage Corp., 303 N.J.
> Super. 405, 409-10 (App. Div. 1997) (citations
> omitted).]

Furthermore, "where there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App Div. 2014) (internal quotation marks omitted) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Id. at 584 (quoting Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 588 (1988)).

Our scope of review is essentially limited to three inquiries:

> (1) whether the agency's action violates express or
> implied legislative policies, that is, did the agency
> follow the law; (2) whether the record contains
> substantial evidence to support the findings on which
> the agency based its action; and (3) whether in applying
> the legislative policies to the facts, the agency clearly
> erred in reaching a conclusion that could not reasonably
> have been made on a showing of the relevant factors.
>
> [In re Adoption of Amends., 435 N.J. Super. at 584.]

A-0936-19

II.

We note the general principles which inform our consideration of the arguments raised on this appeal. According to our Supreme Court,

> the primary objective of the UCL is to provide a cushion for the workers of New Jersey "against the shocks and rigors of unemployment." . . . Because the statute is remedial, its provisions have been construed liberally, permitting a statutory employer-employee relationship to be found even though that relationship may not satisfy common-law principles.
>
> [Carpet Remnant Warehouse, Inc., 125 N.J. at 581 (citations omitted).]

The factors of the ABC test are as follows as follows:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> [N.J.S.A. 43:21-19(i)(6)(A), (B), and (C).]

The Supreme Court has stated:

The ABC test becomes applicable only after a determination that the service provided constitutes "employment," which is defined as "service * * * performed for remuneration under any contract of hire, written or oral, express or implied." N.J.S.A. 43:21-19(i)(1)(A). If the Department determines that the relationship falls within that definition, and is not statutorily excluded, see N.J.S.A. 43:21-19(i)(7), then the party challenging the Department's classification must establish the existence of all three criteria of the ABC test. Conversely, the failure to satisfy any one of the three criteria results in an "employment" classification. That determination is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship.

[Carpet Remnant Warehouse, Inc., 125 N.J. at 581 (citations omitted).]

N.J.S.A. 43:21-19(p) defines remuneration broadly as "all compensation for personal services, including . . . the cash value of all compensation in any medium other than cash." N.J.S.A. 43:21-19(o) defines wages as "remuneration paid by employers for employment." Therefore, wages constitute all compensation paid by an employer for personal services in any medium.

III.

Devereux argues the Commissioner's erred because Handler lacked the personal knowledge necessary to testify to the audits conducted by Bartholomew. It also asserts the payments to the foster parents were not remuneration but "for both therapeutic services as well as to cover the costs of

22

housing the children." We reject these arguments because there was substantial evidence to support the Commissioner's findings.

N.J.A.C. 1:1-15.5 states "hearsay evidence shall be admissible in the trial of contested cases." However, "some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness." Ibid.

At the outset, we note Devereux's reliance on the ALJ's factual findings and legal conclusions is misplaced because the ALJ's decision was not binding on the Commissioner. In re Adoption of Amends., 435 N.J. Super. at 587. Furthermore, as recited above, the Commissioner made detailed findings rejecting the ALJ's decision to assign no weight to the audits, articulated several reasons why the audits "should be given significant evidentiary weight[,]" and explained why Handler's testimony regarding his review of Bartholomew's audits showed the audits were reliable.

The gravamen of Devereux's arguments regarding the Commissioner's remuneration findings asks us to second-guess what is a highly fact-sensitive analysis. We decline to do so because this is not our standard of review. Id. at 584. Moreover, the Commissioner's detailed remuneration determination explained why the therapeutic foster homes were not typical fostering

environments, but delivered specialized services to meet the foster children's needs. Given the broad definition of remuneration, the Commissioner's finding was not plainly unreasonable and was based on substantial evidence in the record. Devereux's other arguments regarding remuneration, including its reliance on non-binding case law and the New Jersey Resource Family Parent Licensing Act[2], which Devereux conceded was inapplicable, lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

IV.

A.

Application of the ABC test to the foster homes.

Devereux argues the Commissioner's finding that the foster homes did not meet part A of the ABC test was error because it did not control the foster parents whom the ALJ found "enjoyed considerable autonomy regarding the details of day-to-day supervision of foster children in their home." Devereux also points to the therapeutic foster parent contracts, which stated Devereux was not permitted to "exercise control or direction over the manner or method" of parenting by the foster parents. Moreover, it asserts foster parents are not compelled to accept children and may terminate the foster relationship at any

---

[2] N.J.S.A. 30:4C-1.1.

time. Devereux notes it does not provide the foster homes with equipment and only reimburses foster parents for their expenses. It argues the evidence presented by the Department showing "(1) certain important decisions regarding care for foster children, e.g., licensing, approval of 'alternate' care givers, etc. 'flow through' Devereux and (2) Devereux ensures that parents adhere to State regulations" was insufficient to prove it controlled the foster homes.

We are unconvinced the foster parents' alleged autonomy, or the contractual language proved Devereux did not control the placement of children in their homes. The therapeutic foster homes operated by Devereux are unlike traditional foster homes where a child's care after placement inside the home is controlled by the foster parent who may confer with the Division of Child Protection and Permanency (Division) to obtain services if needed. The facts here demonstrated Devereux controlled the placement by directing and implementing an intensive care program for the children during their placement.

Devereux argues the Commissioner's part B findings regarding the foster homes was incorrect because the private homes of therapeutic foster parents were extensions of Devereux's business. Citing Carpet Remnant Warehouse, Inc., Devereux argues the standard in part B should refer "only to those locations

where the enterprise has a physical plant or conducts an integral part of its business."

As the Commissioner noted, the analysis under part B "must consider 'not only locations where the enterprise has a physical plant,' but also where the employer conducts an integral part of the business." Clearly, the essence of Devereux's mission is to place children in therapeutic foster homes. Therefore, the Commissioner's finding the foster homes were extensions of Devereux's business was supported by the evidence in the record and Devereux's arguments to the contrary are unconvincing.

Devereux argues the Commissioner's finding it failed to meet part C of the ABC test was error because N.J.S.A. 43:21-19(i)(6)(C) states services provided for remuneration are employment unless it is shown the "individual is customarily engaged in an independently established trade, occupation, profession or business," not that the work must be of the "same nature." Devereux argues because the Legislature is currently considering this exact change, but has not yet adopted it, if we affirm the Commissioner's interpretation of the statute, it will violate legislative intent by inserting terms the Legislature intentionally excluded. Devereux also argues the Commissioner ignored the fact that, by regulation, the foster homes must be independent because N.J.A.C.

3A:51-5.1 requires a "resource family parent shall have sufficient income or other means of financial support prior to the placement of a child, so that the resource family parent is economically independent of board subsidy payments from the [Division]."

In Carpet Remnant Warehouse, Inc., the Court held "if the person providing services is dependent on the employer, and on termination of that relationship would join the ranks of the unemployed, the [part] C standard is not satisfied." 125 N.J. at 585-86. Here, the evidence in the record showed the foster parents earned the majority, if not all, of their income from Devereux. Indeed, due to the therapeutic services deployed inside the foster homes, Devereux's contracts with the foster homes stipulated a foster parent could not be employed outside of the home without Devereux's permission. For these reasons, the Commissioner's part C findings regarding the foster homes was not erroneous.

B.

Application of the ABC test to the Repairpersons and Medical Providers.

Devereux challenges the Commissioner's determination relating to the repairpersons and medical providers by re-asserting its evidentiary arguments

relating to Bartholomew's audit and Handler's competency to testify about it. As noted, we have rejected these arguments.

Notwithstanding the evidentiary arguments, Devereux asserts the evidence the Commissioner did consider does not support his ruling. Devereux argues "Bartholomew's report is incomplete" because "it is based on little more than a review of 1099[]s" and includes no interviews, and "Schedule C tax forms from only eight individuals [are] identified in his report."

We reject Devereux's arguments because under the ABC test, Devereux bore the burden of proof. As we noted, the Commissioner found Devereux failed to meet parts A and C as to the repairpersons and failed to meet parts A, B, and C as to the mental health providers. The Commissioner explained his ruling in findings based on the evidence and we must defer to those findings because they are supported by the record. In re Adoption of Amends., 435 N.J. Super. 584.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0936-19