**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4183-18

IN THE MATTER OF
ALEXIS MILLER,
ESSEX COUNTY
DEPARTMENT OF
CITIZEN SERVICES.

_____

Argued September 13, 2021 – Decided September 23, 2021

Before Judges Vernoia and Firko.

On appeal from the New Jersey Civil Service Commission, Docket No. 2018-1872.

Alexis T. Miller, appellant, argued the cause pro se.

Robin Magrath, Director of Labor Relations, argued the cause for respondent Essex County Department of Citizen Services (Courtney Gaccione, Essex County Counsel, attorney; Robin Magrath, on the brief).

Andrew J. Bruck, Acting Attorney General, attorney for respondent Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Petitioner Alexis Miller is employed by the Essex County Department of Citizen Services, Division of Family Assistance and Benefits (the Division). She appeals from the Civil Service Commission's (the Commission) final administrative decision adopting an administrative law judge's (ALJ) findings and recommendation upholding the Division's removal of Miller from the title of family service supervisor (FSS) at the end of her working test period, and returning her to the title of family service worker (FSW). Having reviewed the record in light of the applicable legal principles, we are convinced the Commission's findings are supported by substantial credible evidence, and we reject Miller's claims the ALJ committed procedural and evidentiary errors warranting reversal. We therefore affirm.

I.

In 2008, Miller began her employment with the Division as an FSW. In September 2017, the Division promoted Miller to the FSS title, subject to her successful completion of a ninety-day working test period.

Nancy Gervickas and Daria Rotondo served as Miller's supervisors during the working test period. In December 2017, following the conclusion of the ninety-day test period, the Division notified Miller of its decision to

2

terminate her from the FSS title and return her to the FSW title to continue her employment in that position.

Miller appealed from her termination from the FSS title. The Commission assigned the matter to an ALJ as a contested case. The hearing commenced on May 24, 2018, and continued on six additional dates in May, July, August, and September. The Division presented Gervickas and Essex County Counsel Courtney M. Gaccione as witnesses. Miller testified on her own behalf, and she called Rotondo and Division employees Tanya Yarrell and Sparkle Myrie as witnesses. Numerous documentary exhibits were also admitted in evidence.[1]

---

[1] Our review of Miller's arguments on appeal is made difficult in part based on her failure to provide all the exhibits admitted in evidence during the hearing before the ALJ. See R. 2:6-1(a)(1)(I) (requiring the appellant to include in the appendix on appeal "such other parts of the record . . . as are essential to the proper consideration of the issues"). In her Initial Decision, the ALJ listed the exhibits admitted in evidence during the hearing. In her appendix on appeal, Miller includes the Civil Service Commission's "STATEMENT OF ITEMS COMPRISING THE RECORD ON APPEAL," listing the exhibits admitted in evidence at the hearing. The documents included in the parties' appendices on appeal are not identified by the exhibit numbers by which they were identified or admitted in evidence at trial. Based on our review of the documents included in the appendices, however, it appears that only the following exhibits admitted in evidence are included: A-5, A-23 to -24, A-38 to -39, A-41, A-45, A-68, R-1, R-3 to -5, R-8, R-13 to -15, R-24, R-29, R-39, R-41 to -42, R-45, R-49 to -50, R-53, R-61, R-81, R-83 to -84, R-86, R-88 to -90, and R-150. It appears the following exhibits admitted in evidence are not included in the record on

The evidence showed Miller worked as an FSW in the Division for nine years before her promotion to the FSS title in September 2017. The Division assigned Miller to the KC unit, where she was tasked with supervising five FSWs during her ninety-day working test period.[2]

During the working test period, the Division formally evaluated Miller's performance every thirty days and also provided her with a cumulative evaluation at the end of the ninety-day period. The purpose of the evaluations was to review any areas in which Miller needed improvement and to provide Miller with resources and assistance to make any necessary improvements.

An FSS's duties include: overseeing and supervising FSWs; ensuring compliance with state and federal regulations; assisting FSWs in understanding regulations; communicating with staff; and assisting in effective communications between office staff and management staff. An FSS is also responsible for reviewing cases completed by FSWs "to ensure that regulations

appeal: A-1 to -4, A-6 to -22, A-25 to -37, A-40, A-42, A-46 to -53, A-57 to -67, R-2, R-6 to -7, R-9 to -12, R-16 to -23, R-25 to -28, R-30 to -38, R-40, R-43 to -44, R-46 to -48, R-51 to -52, R-54 to -60, R-62 to R-80, R-82, R-85, R-87, R-91, R-97, R-99 to -101, R-106 to -108, R-110, R-122, R-134, and R-149. The following exhibits were identified at the hearing, but not admitted in evidence: A-43, R-92 to -95, R-98, R-102 to -105, R-109, R-111 to -121, R-123 to -133, and R-135 to -148.

[2] KC is the designated moniker for the unit to which plaintiff was assigned.

4

are followed and that the [FSW] took appropriate action as far as determination[s] of eligibility" of benefits. It is important that FSWs timely review and submit cases to best serve the Division's clients, who are individuals seeking benefits administered by the Division.

The Division administers benefits under Medicaid, Work First New Jersey, the Temporary Assistance for Needy Families program, and the Supplemental Nutrition Assistance Program. To review a request for benefits, the FSWs and FSSs must be familiar with the regulations applicable to each of the various programs. The duties of an FSS include reviewing the cases to determine whether the FSW followed the applicable regulations and "took appropriate action as far as [the] determination of eligibility." An FSS will approve the action of an FSW when the FSW has determined a client's eligibility for benefits in accordance with the regulations. If, however, the FSS finds an error, then he or she must review the case with the FSW, advise the FSW regarding the error, and return it to the FSW for correction.

Gervickas is an administrative supervisor of family services in the Division, and her duties include the supervision of FSSs. Rotondo is Gervickas's assistant administrative supervisor. They performed Miller's evaluations during her working test period.

Gervickas testified concerning Miller's job performance during the working test period, which began on September 11, 2017. Gervickas described the training provided to Miller, including seven days of formal training on a variety of topics that Miller attended, and several "shadowing" sessions during Miller's first week with two experienced FSSs at the commencement of the working test period. Gervickas provided Miller with the opportunity to shadow a third supervisor, but Miller "declined to set up a time with that supervisor."

Gervickas explained she met with Miller within a week of Miller's start as an FSS because several staff members complained Miller was "abrasive" and spoke to them aggressively. Gervickas counseled Miller concerning the importance of proper communications with staff.

Gervickas also described a number of errors Miller made directing FSWs to make corrections in their benefits determinations. As explained by Gervickas, many of the corrections directed by Miller were not warranted under the applicable program regulations. In each instance, Miller's errors potentially caused a delay in the Division's clients' receipt of benefits. In one instance, Miller directed an FSW to "rebatch" a case because Miller had failed to timely review it. Gervickas further testified rebatching cases is "frowned

A-4183-18

upon" because it results in extra work and delays a client from receiving benefits.

On September 25, 2017, the FSWs under Miller's supervision filed a grievance against her, claiming she was "unprofessional" and "abrasive." Three days later, in an attempt to help the unit work collaboratively, Gervickas held a meeting with Miller and the FSWs. Gervickas and Rotondo also separately met with Miller, explaining the reasons rebatching cases was a bad practice. According to Gervickas, Miller minimized the fact that rebatching cases created more work for the FSWs. Gervickas also spoke with Miller concerning the lunch schedule for the FSWs in her unit because the FSWs had issues with the lunch schedule Miller created.

During Miller's first thirty days in the FSS title, Gervickas met with her and discussed her backlogged cases and time management issues. Gervickas testified she also offered Miller training on the applicable regulations, but Miller declined. Gervickas further explained she also attempted to conduct weekly coaching and mentoring sessions with Miller, but Miller "didn't feel they were necessary," so the sessions were scheduled every two weeks. During an October 4, 2017 meeting, Gervickas discussed working collaboratively with the FSWs, conflict resolution, and program regulations

A-4183-18

with Miller, and Miller stated she did not need additional training or assistance concerning the regulations because she was familiar with them.

Gervickas and Rotondo first evaluated Miller on October 10, 2017. Miller received the lowest score possible—a one on a scale of one to six—in each of the six areas graded: quality of work, quantity of work, attitude towards work, personal relations, professional interest, and supervisory effectiveness. Gervickas explained the reasons for the low scores, including: Miller's numerous errors on cases that involved the basic regulations applicable to the benefits programs; the backlogging of Miller's cases; Miller's failure to comply with directives concerning work assignments; Miller's difficulties communicating and working cooperatively with the FSWs and other staff; Miller's decisions to decline offers of assistance; and Miller's failure to effectively communicate with the FSWs in her unit to assist them in applying program regulations. Gervickas testified the evaluation included recommendations for improvement made to Miller.

Gervickas also testified concerning the second thirty-days of Miller's working test period. Gervickas explained that on October 11, 2017, she reprimanded Miller for failing to follow supervisory directives regarding "staff assignments, case actions, case banking processes, submission of cases, and

8

case conferences."  During the reprimand, Miller told Gervickas, "I feel sorry for you."

On October 16, 2017, Miller incorrectly directed an FSW to transfer a case to the Medicaid office.  Under the applicable regulations, the case should have been transferred to the office handling a different program.  The next day, Gervickas sent Miller a memo noting that Miller had erroneously reported that several cases were complete when they were not.  On October 19, 2017, Miller sent an email advising Gervickas she wanted to forego a scheduled coaching session in part because she did not believe she needed it.  Nonetheless, Gervickas conducted the coaching session, reviewed Miller's errors, and asked if Miller needed any assistance.  Miller declined the assistance offered.

Gervickas further testified that later in October she was forced to reassign one of Miller's cases to another FSS to ensure its timely processing, and that the case was delayed because Miller did not timely review it in the first instance.  In a separate incident, Gervickas gave repeated directives to Miller to correct an error in a case, but Miller did not correct the error.  On October 27, 2017, Gervickas issued a written reprimand to Miller for insubordination because Miller failed to comply with supervisory directives.

On November 1, 2017, members of the KC unit sent a letter to Gervickas expressing "frustrations" with Miller. The letter concerned in part Miller's "repeated[]" returns of cases to the FSW's for reasons that did not require the returns.

On November 10, 2017, Miller received her second evaluation, which covered the period from October 11, 2017 to November 10, 2017. Miller again received the lowest ratings in each of the six graded categories. Gervickas explained Miller received the ratings because she continued to have backlogged cases, make errors relating to the application of regulations and polices, and fail to communicate effectively with the other staff members.

Gervickas further testified concerning the final thirty days of Miller's working test period. Gervickas detailed errors made by Miller on December 1, 2017, when she closed a case that had not been completed. As a result of the error, it was necessary to reprocess the case a second time. In early December, Gervickas also reviewed four of Miller's cases and found errors in three of them.

Gervickas provided Miller with a third evaluation, covering the period from November 11, 2017 to December 10, 2017. Gervickas scored Miller with a rating of two out of six in the areas of quality of work and personal relations,

10

A-4183-18

but she gave Miller scores of one in the four other graded areas. Miller's average rating was 1.33, which Gervickas testified was unsatisfactory. Gervickas explained Miller received unsatisfactory ratings because she continued to make errors relating to "programmatic knowledge" and had difficulties communicating with staff. Gervickas noted, however, Miller's scores relating to personal relations slightly increased because Miller had improved her communications with Gervickas and Rotondo and Miller tried to improve her relations with other staff members in her unit.

Gervickas explained she offered Miller assistance throughout the working test period, and she detailed her efforts, as well as Miller's resistance to those efforts including, in some instances, Miller's refusals to take advantage of assistance and training that was offered. Gervickas also testified in detail about the complaints concerning Miller from KC staff members, and Miller's complaints about different FSWs in the unit.

Gervickas testified regarding Miller's final three-month evaluation that included a cumulative final rating based on her entire probationary period. Gervickas testified Miller received an unsatisfactory rating because she continued to make case errors, could not communicate effectively with other staff members, and lacked program and regulation knowledge. As a result, the

11

Division decided to terminate Miller from the FSS title at the end of the working test period and return her to the FSW title.

Rotondo testified concerning her involvement in the supervision of Miller and in the evaluation of Miller's performance. She also detailed issues Miller had with the FSWs, including their complaints about Miller's scheduling of their lunches and Miller's return of cases to them that should not have been returned under the regulations. Rotondo reviewed the cases about which the FSWs complained, and she agreed Miller should not have returned the cases to the FSWs. According to Rotondo, there were only a few days during the test period Miller did not make errors, and Rotondo described Miller's errors as "recurrent."

Rotondo explained she coached Miller on various issues, gave Miller copies of regulations, and offered Miller training. Rotondo found Miller's performance unsatisfactory, and she testified the evaluations fairly and accurately described Miller's performance in the graded areas. She also stated the poor ratings were the product of Miller's backlog of cases, errors, and lack of desire to attend training sessions that were offered. Rotondo also testified Miller was insubordinate throughout the working test period by failing to follow directives.

12

Miller testified that FSSs are not provided training prior to the start of work in the title. She also testified she "was met with resistance and opposition" by staff members, and that they "berate[d] and belittle[d]" her during the working test period. She further asserted she was placed in the KC unit "to fail" because Gervickas "had a vendetta against" her based on them having worked together seven years earlier. Miller further claimed Jeanette Page-Hawkins, the head of the Division, similarly had a vendetta against her because she had complained about issues at the office where she had been employed prior to her promotion to the FSS title.

Miller denied Gervickas provided the training, and she testified Gervickas's and Rotondo's frequent memos concerning her were sent to create "a paper trail" to aid in terminating her from the FSS title.

Miller, however, admitted the programs and regulations she was required apply in the FSS title were identical to those she applied as an FSW. She also acknowledged she could not recall any "bad interactions" with Gervickas when they worked in a different office in the Division many years earlier. Miller admitted she declined Gervickas's attempts to provide her with program training, claiming she "didn't need training with programs," and Miller

13

testified she did not attend on-the-job training or any overview sessions offered by Gervickas.

As noted, Miller called Yarrell as a witness. Yarrell testified she is an FSW who worked on the same floor as Miller during the working test period. Yarrell was not part of the KC unit, but she sat approximately two feet away from Miller at the office.

Yarrell testified she asked Miller for help, and Miller assisted her. Yarrell also testified she believed there were "differences" between Miller and the other staff members in the KC unit, and also that Miller "didn't get along" with the other members of the unit. Yarrell noted that many issues within the KC unit could have stemmed from the fact that Miller is "aggressive."

Myrie was the final witness Miller presented. Myrie is an FSW who worked on the same floor as Miller during the working test period. She explained the KC unit did not have an FSS for approximately two years prior to Miller's promotion.

Myrie testified Miller had a reputation as being "not approachable" and "not the nicest person." She also testified she believed Miller wanted to be a good FSS and took her position seriously.

Myrie testified she told Miller in a text message that Miller's time as an FSS "was definitely a setup" because Miller's supervision of some of the FSWs who previously had been Miller's peers may have prevented Miller from having a "fair chance" when she became a supervisor. Myrie also testified she believed Gervickas has an "open door policy," and Gervickas and Rotondo are "accommodating."

The final witness at trial, Essex County Counsel Gaccione, was called by the Division. Gaccione testified generally about an October 2017 meeting she attended with representatives of the Division, the County's Human Resources Department, Miller, and Miller's union representative. The purpose of the meeting was to discuss Miller's complaints she was being treated unfairly during the working test period. Based on the discussion during the meeting, Gaccione concluded Miller's complaints were personnel-related and did not include allegations rising to "a level of a violation of the law."

Following the submission of post-hearing briefs, the ALJ issued a written Initial Decision finding Miller was hired by the Division in 2008 as an FSW and was promoted on a provisional basis to the FSS title in 2017 for a ninety-day working test period. The ALJ found an FSS's duties include

15

assigning and supervising the work of FSWs, and the performance of the FSS's duties requires both interpersonal skills and knowledge of certain regulations.

The ALJ found Gervickas and Rotondo supervised Miller during the working test period, and they provided Miller with four written performance evaluations. In each evaluation, Miller received an "unsatisfactory" rating. The ALJ further found the ratings were based on Gervickas's and Rotondo's observations of, and interactions with, Miller.

The ALJ determined Gervickas arranged sufficient training for Miller to be an effective supervisor and that Gervickas reasonably expected Miller to have an understanding of the relevant laws and regulations, as well as the general process through which cases should be processed, because Miller had nine years of experience processing cases as an FSW. The ALJ found, however, that during the working test period Miller did not demonstrate she had the requisite knowledge—or interpersonal skills—to effectively supervise FSWs. The ALJ observed that the documentary evidence, including the case correction review sheets Miller created, and the many grievances filed by and against Miller, supported the conclusion that Miller failed to satisfactorily perform the duties of an FSS during the test period. The ALJ also determined Miller did not present any credible evidence establishing bias or any other

16

inappropriate reasons for the manner in which Gervickas and Rotondo trained, supervised, and evaluated Miller.

After setting forth her factual findings, the ALJ concluded the evidence established the Division acted in good faith in evaluating Miller's performance, determining Miller should be terminated from the FSS position, and returning Miller to her former FSW title. The ALJ credited the evidence that Miller performed poorly as an FSS during the test period. The ALJ ordered, subject to the Commission's consideration, that the Division's decision terminating Miller from the FSS title and returning her to the FSW title should be affirmed and her appeal should be dismissed.

The Commission later adopted the ALJ's findings of fact and conclusions, affirming Miller's termination from the FSS title and returning her to the FSW title. This appeal followed.

## II.

"Our scope of review of an administrative agency's final determination is limited." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 582 (App. Div. 2014). Our standard of review is guided by three inquiries:

> (1) [W]hether the agency's action violates express or implied legislative policies, that is, did the agency

follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[Blanchard v. N.J. Dep't of Corr., 461 N.J. Super. 231, 238 (App. Div. 2019) (quoting In re Carter, 191 N.J. 474, 482 (2007)).]

The burden of demonstrating that a final agency decision should be reversed falls on the party challenging the decision. Adoption of Amends., 435 N.J. Super. at 582-83. "[W]here there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs," id. at 583 (alteration in original) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)), and we "may not substitute [our] . . . judgment for the agency's, even though [we] might have reached a different result," In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Carter, 191 N.J. at 483). However, we are "in no way bound by an agency's . . . determination of a strictly legal issue." K.K. v. Div. of Med. Assistance & Health Servs., 453 N.J. Super. 157, 161 (App. Div. 2018) (quoting L.A. v. Bd. of Educ. of Trenton, 221 N.J. 192, 204 (2015)).

"The whole purpose of a probationary or working test period under the civil service system is to supplement the examining process by providing a means for testing an employee's fitness through observed job performance under actual working conditions." Dodd v. Van Riper, 135 N.J.L. 167, 171 (E. & A. 1947); see also N.J.S.A. 11A:4-15; N.J.A.C. 4A:4-5.1(a).  An appointing authority may terminate an employee's employment in a title after a working test period if it in good faith determines the employee's performance during the probationary period was not satisfactory.  Dodd, 135 N.J.L. at 171; see N.J.S.A. 11A:4-13(a); N.J.A.C. 4A:2-4.1(a).  Where the appointing authority terminates an employee's employment in a title at the end of a working test period, the question is "whether the authority exercised good faith in determining that the employee was not competent to perform satisfactorily the duties of the position." Briggs v. Dep't of Civ. Serv., 64 N.J. Super. 351, 356 (App. Div. 1960).  If the Commission finds the appointing authority acted in bad faith, the employee is entitled to a new working test period and other appropriate remedies.  N.J.A.C. 4A:2-4.3(c).  The employee bears the burden of proving the appointing authority terminated the employee's appointment to the title in bad faith.  N.J.A.C. 4A:2-4.3(b).

A-4183-18

Miller's arguments on appeal are limited. She contends the ALJ erred by: denying her request for an adjournment on the first day of the hearing; improperly complimenting the Division's counsel; changing the order of the presentation of witnesses; denying her request for a trial subpoena for Page-Hawkins; failing to give weight to a text message; and commencing the preparation of the Initial Decision before her post-hearing brief was submitted.

Miller's arguments are directed solely to alleged procedural and evidentiary errors made by the ALJ. She does not claim the Commission failed to follow the law or that the Commission's decision could not reasonably have been made based on a consideration of the relevant factors. See Blanchard, 461 N.J. Super. at 238. Miller also does not argue the Commission's decision lacks support in substantial credible evidence presented during the hearing. See ibid.

Based on our independent review of the record, we are convinced the ALJ's findings of fact and conclusions of law, which the Commission adopted, are amply supported by the evidence. The ALJ accepted as credible the evidence establishing that during the working test period Miller resisted and refused training opportunities, demonstrated a lack of knowledge of the pertinent regulations, made numerous and recurrent errors, and had difficulty

20

communicating effectively with the KC unit staff. Miller received very low scores in all the graded areas in her periodic and cumulative evaluations. The record is bereft of evidence establishing the Division acted in bad faith in its assessment of Miller's performance or its decision to terminate her from the FSS title and return her to the FSW title.

Miller failed to sustain her burden of establishing the Division acted in bad faith before the Commission, see N.J.A.C. 4A:2-4.3(b), and fails to sustain her burden on appeal of demonstrating a basis to reverse the Commission's decision, see Adoption of Amends., 435 N.J. Super. at 582-83. We therefore affirm the Commission's decision, and we are not persuaded the alleged procedural and evidentiary errors about which Miller complains require a different result.

Miller first argues the ALJ improperly denied her request for an adjournment on the first day of the hearing because she "wasn't prepared to go up against [the Division's] attorney" and she had received over 1000 documents in discovery "to decipher." We review a decision to grant or deny an adjournment request for an abuse of discretion. State ex rel. Comm'r of Transp. v. Shalom Money St., LLC, 432 N.J. Super. 1, 7 (App. Div. 2013); see

21

also N.J.A.C. 1:1-9.6(d) (providing an ALJ may grant an adjournment "only for good cause").

We find no abuse of discretion in the ALJ's denial of an adjournment request that was made just as the long-scheduled hearing was about to begin. Miller ignores that she sought an expedited hearing in the matter. She complained she had received numerous documents from the Division in the week prior to the hearing, but, as the Division's attorney explained, the late exchange of discovery was delayed by Miller's failure to arrange for delivery of her discovery to the Division. Given those circumstances, the ALJ did not abuse her discretion by denying Miller's last-minute adjournment request.

Moreover, even if the ALJ erred by denying the request, Miller was not prejudiced. The Division presented a single witness, Gervickas, on the first day of the hearing, and her direct examination was not completed that day. Thus, Miller was not required to begin her cross-examination of Gervickas until a week later, when the hearing continued. We also note that when the ALJ denied Miller's request for an adjournment, the ALJ informed Miller she could renew her request at the end of the day. Miller, however, did not seek an adjournment following Gervickas's testimony at the end of the first day of the hearing or at any time thereafter.

22

Miller next contends she was "intimidate[ed]" and "led . . . to believe that the [ALJ] had already decided the case" because, during an off-the-record conference, the ALJ complimented the Division's counsel, stating counsel had done a "good job," and changed the order of the presentation of witnesses at the hearing. We are not persuaded the ALJ's comment or decision to change the order of witness presentation requires or permits a reversal of the Commission's decision.

In the first instance, although there is no transcript of the discussions upon which Miller's arguments are based, correspondence exchanged between Miller and the ALJ establishes the ALJ's decision to change the order of the presentation of witnesses was made in response to Miller's request that the hearing not be delayed. The ALJ advised Miller she would reconsider the revised presentation order if Miller determined it was "necessary for the effective presentation of [Miller's] appeal" from the Division's decision. Miller never subsequently indicated a revision to the order of presentation of the witnesses was necessary.

Under those circumstances, we find the ALJ's modification of the order of the presentation of witnesses constituted a proper exercise of her broad discretion. See N.J.A.C. 1:1-14.6(l) ("The judge may determine that the party

23

with the burden of proof shall not begin the presentation of evidence and may require another party to proceed first."); N.J.A.C. 1:1-14.6(p) ("The judge may take such other actions as are necessary for the proper, expeditious and fair conduct of the hearing or other proceeding . . . ."); see also N.J.A.C. 1:1-14.6(f) ("The judge may establish special accelerated or decelerated schedules to meet the special needs of the parties or the particular case."). Additionally, Miller makes no showing the change in the witness order resulted in any prejudice.

The ALJ acknowledged she stated during a conference that the Division's attorney did a "good job." Miller contends the comment demonstrated the ALJ was biased or otherwise had decided the case prior to the presentation of the evidence. The ALJ, however, explained the comment was limited to an acknowledgement the Division's counsel did a "good job" "of framing the context of the decision being appealed" through her examination of the first witness. Thus, the comment did not constitute an opinion on the merits of the parties' respective cases and it was not an endorsement of the Division's arguments; it was instead an acknowledgement the Division's counsel ably framed an issue presented for the ALJ's decision. Indeed, the ALJ addressed Miller's concern about the statement, explaining she "ha[d]

24                                                                    A-4183-18

made no decision with respect to the merits" of the case and "regret[ted] if [her] choice of words gave [Miller] reason to doubt [her] neutrality."

ALJs are governed by a Code of Judicial Conduct, see N.J.A.C. 1:1-1.5; N.J.A.C. 1:1 app., that in all pertinent respects mirrors the Code of Judicial Conduct for judges in the judiciary, Code of Judicial Conduct, Canons 1 to 7. Indeed, we have recognized principles embodied in the Code of Judicial Conduct apply to ALJs. Sheeran v. Progressive Life Ins., 182 N.J. Super. 237, 243 (App. Div. 1981).

"The overarching objective of the Code of Judicial Conduct is to maintain public confidence in the integrity of the judiciary." In re Advisory Letter No. 7-11 of the Sup. Ct. Advisory Comm., 213 N.J. 63, 71 (2013). "Such confidence 'depends on a belief in the impersonality of judicial decisionmaking.'" State v. Presley, 436 N.J. Super. 440, 447 (App. Div. 2014) (quoting United States v. Nobel, 696 F.2d 231, 235 (3d Cir. 1982)). Thus, even "[t]he mere appearance of bias may require disqualification." N.J. Div. of Youth & Fam. Servs. v. P.C., 439 N.J. Super. 404, 415 (App. Div. 2015) (quoting Panitch v. Panitch, 339 N.J. Super. 63, 67 (App. Div. 2001)). Those principles apply with equal force to ALJs under their Code of Judicial Conduct.

Canon 3, Rule 3.15(B) of the Code of Judicial Conduct for ALJs provides that ALJs "shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned." The identical provision in the Code of Judicial Conduct for judges in the judiciary, Canon 3.17(B), has been interpreted to require that "before [a] court may be disqualified on the ground of an appearance of bias, the belief that the proceedings were unfair must be objectively reasonable." State v. Marshall, 148 N.J. 89, 279 (1997). Our Supreme Court established the following standard to determine whether an appearance of bias exists: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517 (2008). If so, and "if the judge's conduct gave the public 'reason to lack confidence in the integrity of the process and its outcome[,]'" then the court must reverse and remand the matter for retrial. Kane Props., LLC v. City of Hoboken, 214 N.J. 199, 221 (2013) (alteration in original) (quoting DeNike, 196 N.J. at 517).

Measured against this standard, we are not convinced the ALJ's statement the Division's attorney did a good job framing an issue in the case would cause a fully informed person to have doubts about the ALJ's impartiality. The comment does not reflect or suggest any bias or impartiality

26

concerning the merits of the dispute. As noted, and as the ALJ explained, the comment constituted nothing more than an acknowledgement the Division's counsel framed an issue that the ALJ was then required to decide on the merits.

Miller next contends the ALJ erred by denying her request for a subpoena compelling Page-Hawkins's testimony at trial. We are not persuaded. An ALJ may issue a subpoena to a Division Director "only if the requesting party makes a showing that the subpoenaed individual has firsthand knowledge of, or direct involvement in, the events giving rise to the contested case, or that the testimony is essential to prevent injustice." N.J.A.C. 1:1-11.1(a). Miller made, and makes, no such showing here.

The gravamen of Miller's case is that she performed well during her working test period, and Gervickas and Rotondo, who supervised and evaluated her performance, failed to adequately train her and inaccurately determined her performance was unsatisfactory based on some unproven, sinister, ulterior motive. Miller argues Page-Hawkins had evidence pertinent to the ALJ's determination of the propriety of the Division's decision, but, as the ALJ found, there is no evidence Page-Hawkins had firsthand knowledge of the events giving rise to Miller's claim—her job performance during the

working test period.  See ibid.  The evidence showed only that Page-Hawkins attended a meeting to discuss issues related to Miller's complaints during the working test period, and Gervickas, Rotondo, Gaccione, and Miller testified about what occurred during the meeting.[3]  We are therefore not convinced Page-Hawkins had firsthand knowledge of the events that give rise to the case or that her testimony was required to prevent an injustice.  Miller makes no showing to the contrary.

Miller next contends the ALJ erred by failing to give adequate weight to a text message Miller received from a friend stating Miller should be "careful" in her FSS position because "word is" that "they" are trying to set her up at the KC office.  The argument is without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), other than to note that the alleged author of the text message did not testify at the hearing and Miller acknowledges the text message reflects nothing more than a rumor.  The ALJ did not abuse her discretion by assigning little weight to the purported substance of the text message.

---

[3]  Miller also contends Page-Hawkins was a necessary witness because she could explain why Gervickas did not attend an October 2017 meeting to discuss Miller's complaints about the KC unit.  Miller does not demonstrate, however, how or why Gervickas's failure to attend the meeting, or her reason for failing to attend, matters to the disposition of the issues presented at the hearing, before the Commission, or on appeal.

We similarly find Miller's last argument—that the Commission's decision should be reversed because the ALJ began writing her decision before Miller delivered her post-hearing brief—is without sufficient merit to warrant discussion. Ibid. We add only that regardless of the timing of the commencement of the ALJ's writing process, there is no dispute the ALJ received Miller's brief prior to the issuance of the Initial Decision, and Miller does not identify any arguments contained in her post-hearing brief the ALJ did not fully consider and address. In addition, and as noted, the ALJ's findings and conclusions of law are fully supported by the evidence and are consistent with the applicable legal principles.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4183-18